## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KENNETH NOWLING, individually
and on behalf of all others similarly
situated,

Plaintiff,

v.

JAGUAR LAND ROVER NORTH
AMERICA, LLC, a Delaware limited
liability company,

Defendant.

Civil Action No. _

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

1.     Plaintiff Kenneth Nowling ("Plaintiff"), individually and on behalf of

all others similarly situated, brings this action against Jaguar Land Rover North

America, LLC ("Defendant" or "JLRNA").  Plaintiff alleges the following based on

personal knowledge as to his own acts and based upon the investigation conducted

by his counsel, including analysis of publicly available information, as to all other

allegations:

### INTRODUCTION

2.     Plaintiff brings this consumer class action lawsuit because Defendant

manufactured, marketed, distributed, and sold 2018-2024 Land Rover Range Rover,

2018-2024 Land Rover Range Rover Velar, 2018-2024 Land Rover Range Rover

Sport, 2018-2024 Land Rover Discovery, and 2020-2024 Land Rover Defender (the

"Class Vehicles") without disclosing the existence of a troubling defect that jeopardizes the safety of Class Vehicle drivers, passengers, and other drivers and pedestrians.

3.      Beginning in 2018 if not before, Defendant knew that the Class Vehicles contained one or more defects in the radiator assembly.  Discovery will show that the Class Vehicles' radiator, radiator hose, and related components are defective in that they are designed, manufactured, and/or installed in a manner that causes cracks in the radiator and/or leaks from the radiator hose(s), which lead to coolant leaking out of the vehicle. ("Radiator Defect" or "Defect"). The Defect increases the risk of the engine overheating, stalling, and potentially failing, and, discovery will show, likely is the result of: 1) inadequately designed, manufactured, or installed radiator assemblies; 2) the use of inadequate materials in the radiator assemblies which begin to degrade from the moment the components are exposed to coolant; and/or 3) improper design of the radiator assemblies.

4.      Defendant failed to disclose these material facts and safety concerns to purchasers and lessees of the Class Vehicles.

5.      Defendant sold the Class Vehicles with a 4-year/50,000-mile New Vehicle Limited Warranty that purports to cover the radiator and related components. However, owners and lessees have often complained that they refused a sufficient repair or replacement of the radiator components, even when within the warranty period. This is evidenced through Class Member complaints to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that

Defendant's authorized dealerships are ineffectively repairing radiator components or refusing repair.

6.     The Radiator Defect is inherent in each Class Vehicle and was present at the time of sale or lease.

7.     Accordingly, discovery will show that, since the beginning of 2018, Defendant has known that the Class Vehicles' radiator, radiator hose, and related components were defective and would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement radiator, radiator hose, and related components installed would be equally as defective as the originals, and that the radiator, radiator hose, and related components would cause the symptoms of the Radiator Defect described above. Nevertheless, Defendant continued to equip the Class Vehicles with defective radiators, radiator hoses, and related components. Moreover, Defendant not only refused to disclose the alleged Radiator Defect to consumers, but also it actively concealed, and continues to conceal, its knowledge concerning the Radiator Defect.

8.     Defendant undertook affirmative measures to conceal radiator, radiator hose, and related components' failures and other malfunctions through, *inter alia*, Technical Service Bulletins ("TSBs") issued to authorized repair facilities only and not provided to owners or lessees.

9.     Defendant had superior and/or exclusive knowledge of material facts regarding the Radiator Defect from pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendant's dealers – who are its agents for vehicle repairs-- customer complaints made directly

to JLRNA, dealer audits, aggregate warranty information, consumer complaints to, and resulting notice from, NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

10.    The Defect is material because, *inter alia,* it poses a safety concern, as attested by Class Members in complaints to NHTSA, and to other online forums.

11.    Defendant's failure to disclose the Defect has caused Plaintiff and putative Class Members to lose the use of their vehicles and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendant. Discovery will show that, in an effort to conceal the Defect, Defendant has instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as leaking coolant. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth *infra*.

12.    Had Defendant disclosed the Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, or would have required Defendant to replace, or pay for the replacement of, the defective radiators, radiator hoses, and related components with non-defective versions before their warranty periods expired.

4

## JURISDICTION AND VENUE

13.    This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff and many members of the Class are citizens of states different from Defendant, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

14.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant because JLRNA has its principal place of business and headquarters in this District; JLRNA conducts substantial business in this District; and upon information and belief, significant conduct involving Defendant giving rise to the Complaint took place in this District.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, JLRNA has its principal place of business and regularly conducts business in this District, and JLRNA is a resident of this District under 28 U.S.C. § 1391(c)(2) and subject to personal jurisdiction in this District. Plaintiff's counsel's Declaration of Venue, to the extent required under California Civil Code section 1780(d), is attached hereto as **Exhibit 1**.

## PARTIES

**<u>Plaintiff</u>**

16.    Plaintiff is a California citizen who resides in Menifee, California.

17.    On or around April 21, 2023, Plaintiff purchased a used 2018 Land Rover Range Rover from Land Rover Riverside, an authorized JLRNA dealership located in Riverside, California.

18.    Plaintiff purchased his vehicle primarily for personal, family, or household use.

19.    Safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Plaintiff reviewed the vehicle's CARFAX report and purchase agreement and discussed the vehicle with an authorized JLRNA dealership representative. Relying on these representations, Plaintiff believed that the 2018 Land Rover Range Rover would be a safe and reliable vehicle. When Plaintiff purchased his vehicle, he was unaware that the vehicle contained the Radiator Defect.

20.    Plaintiff was never informed by Defendant that his vehicle suffered from the Defect. Defendant's omissions were material to Plaintiff. Had Defendant disclosed its knowledge of the Defect before he purchased his vehicle, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

21.    In or around September 2023, Plaintiff began to experience the Defect. Specifically, coolant was leaking out of the Class Vehicle. Plaintiff took the Class Vehicle to an authorized JLRNA dealership, where they performed repairs for which Plaintiff had to pay out of pocket. In or around March 2024, Plaintiff took the Class Vehicle to an authorized JLRNA dealership again for coolant leaking and the engine

overheating. The dealership performed repairs that Plaintiff had to pay for out of pocket. In or around May 2024, Plaintiff took his Class Vehicle to JLRNA Riverside because it was leaking coolant and repeatedly lost power while driving. The radiator, fan, gaskets, hoses, and belts needed replacement due to the Defect. To date, Plaintiff's vehicle is still at Land Rover Riverside, has not been repaired, and continues to be defective.

22.    As a result of the Radiator Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

23.    At all times, Plaintiff, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant**

24.    Defendant JLRNA is a Delaware limited liability company with its headquarters and its principal place of business at 100 Jaguar Land Rover Way, Mahwah, New Jersey 07495.

25.    Defendant JLRNA, through its various entities, markets, distributes, warranties, and sells Land Rover and Jaguar automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States including California. JLRNA maintains many operational facilities throughout the United States to effectively market, distribute, warrant and sell its automobiles.

7

26.    In order to sell vehicles to the general public, JLRNA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new JLRNA branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties JLRNA provides directly to consumers who purchased vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to JLRNA instructions, issued through service manuals, TSBs, technical tips ("TT"), and other documents. Per the agreements between JLRNA and the authorized dealers, consumers such as Plaintiff are able to receive services under JLRNA's issued warranty at dealer locations that are convenient to them, making Plaintiff and consumers the third-party beneficiary of these contracts. These agreements provide JLRNA with a significant amount of control over the actions of the authorized dealerships, of which there are more than 200 in the United States.

27.    JLRNA drafted the warranties it provides directly to consumers such as Plaintiff. These warranties are provided on a take-it-or-leave-it basis and give JLRNA the sole power in determining whether a repair is coverable by the warranty. JLRNA designated its authorized dealerships as its agents to perform warranty repairs.

28.    JLRNA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. JLRNA is also responsible for the content of the Monroney Stickers on Land Rover and Jaguar-branded vehicles, the information for which comes from

8

the manufacturer. JLRNA also fulfills the role of reporting, recall, and other duties under federal motor vehicle safety laws and in interfacing with NHTSA.

29.     Defendant JLRNA manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiff's vehicle.

## FACTUAL ALLEGATIONS

30.     Defendant designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendant sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California, New Jersey, and nationwide. Defendant warrants and services the Class Vehicles through their nationwide network of authorized dealers and service providers.

31.     Defendant provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The terms of these warranties are non-negotiable and Defendant exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

32.     The NVLW provided by JLRNA includes basic bumper to bumper warranty coverage, stated in relevant part:

> JLR warrants that during the warranty period, if a Land Rover vehicle is properly operated and maintained, repairs required to correct defects in factory-supplied materials or factory workmanship will be performed without charge upon presentment for service at a Land Rover retailer/authorized repairer; any component covered by this warranty found to be defective in materials or workmanship will be repaired, or replaced, without charge with a new or re-manufactured part distributed by JLR at its sole option.

The warranty period for the vehicle begins on the date of the first retail sale, or on the date of entry into demonstrator or company service, whichever occurs first. The basic warranty period is for four (4) years or until the vehicle has been driven 50,000 miles (80,000 kilometers), whichever occurs first.[1]

### The Radiator Defect

33.    Discovery will show that the Radiator Defect results from the defective design and/or manufacturing of the radiator assemblies and their mounting framework in the Class Vehicles, including use of inadequately sized auxiliary radiator ducts, as seen below:





Fig. 1[2]                                    Fig. 2[3]

---

[1] Land Rover, 2020 Discovery Sport "Vehicle Warranties," available at: https://www.ownerinfo.landrover.com/document/3A/2020/1030950/proc/G2389908/G2426809 (last accessed Jul. 9, 2024).

[2] Figure one depicts an inadequately sized auxiliary radiator duct from a Class Vehicle, as depicted in JLRNA TSB No. JLRTB02027NAS3.

[3] Figure two depicts the same auxiliary radiator duct after having been modified to the correct or adequate size, also as depicted in JLRNA TSB No. JLRTB02027NAS3.

34.     Radiators are the main component of modern vehicle cooling systems, including in the Class Vehicles. They keep the engine coolant fluid at the proper level. In a typical, not-defective vehicle, the coolant circulates throughout the engine and keeps the engine components from overheating. Cooling fins inside radiator cool the engine coolant fluid as it passes over them. Radiator hoses transport the coolant throughout the engine, thereby cooling the engine. The coolant liquid absorbs transferred heat due to contact with the engine and then flows through a hose and into the radiator to cool itself down. Once the temperature of the coolant has lowered, the coolant re-circulates through the engine, continuing the cycle.

35.     In the Class Vehicles, however, coolant leaks through cracks in the radiator assemblies created by the assemblies' repeated torsion and flexion within the radiator mounting framework, including the auxiliary radiator duct.

36.     As designed and manufactured by JLRNA, the auxiliary radiator assemblies in the Class Vehicles are not seated properly within the mounting framework (e.g., the auxiliary radiator ducts) because the mounting framework is inadequately sized and fitted to the Class Vehicles.

37.     This allows the radiator assemblies to flex and shift within the framework, causing the assembly materials to weaken over time, resulting in cracks to the radiator assemblies themselves.

38.     Engine coolant is then able to leach out of the vehicle at the radiator assembly site. Due to this leaking, insufficient coolant remains in the engine to properly cool it, which results in the engine overheating. The engine overheating can then cause catastrophic damage. In addition, when an overheated engine reaches a

11

certain degree, the overheating causes a loss of oil viscosity, which may lead to complete engine seizure, and in some instances, engine fire.

39.    Discovery will show that all Class Vehicles' radiator assemblies are designed, manufactured, and installed by Defendant in substantially the same manner.

40.    Discovery will confirm that the Radiator Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed radiator assemblies in the Class Vehicles.

41.    The Radiator Defect alleged is inherent in, and the same for, all Class Vehicles.

### The Radiator Defect Poses an Unreasonable Safety Hazard

42.    The Radiator Defect poses an unreasonable safety hazard. The Defect causes cracks in the radiator and/or leaks from the radiator hose(s), which lead to coolant leaking out of the vehicle, engine overheating, stalling, and potentially failing which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards.

43.    Federal law requires automakers like Defendant to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

44.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Defendant knew or should have known of the many complaints about the Radiator Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendant to the Radiator Defect.

45.    With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Radiator Defect which are available through NHTSA's website, NHTSA.gov. Many of the complaints reveal that Defendant, through its network of dealers and repair technicians, has been made aware of the Radiator Defect. In addition, the complaints indicate that despite having knowledge of the Radiator Defect and even armed with knowledge of the exact vehicles affected, Defendant often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

### 2018 Land Rover Range Rover Velar

a.    **DATE OF INCIDENT:** November 5, 2023
**DATE COMPLAINT FILED:** November 9, 2023
**NHTSA/ODI ID:** 11554425
**SUMMARY:** My car had a coolant leak and started overheating and i immediately took it to the dealership. It was found that the water pump and coolant was leaking in the front and back and the temp gauge was broken. This car has less than 68k miles and shouldn't happen. I found a recall with the same vehicle but my vin is not pulling up in the recall.

I also found out from other services that they are fixing this a lot with the model and the manufacturer won't take responsibility. If this isn't fixed my car will catch fire.

b.  **DATE OF INCIDENT:** February 27, 2023
**DATE COMPLAINT FILED:** July 7, 2023
**NHTSA/ODI ID:** 11530796
**SUMMARY:** The contact owns a 2018 Land Rover Range Rover Velar. The contact stated that coolant was leaking on the ground underneath the vehicle. The low coolant level warning light was illuminated. There was oil in the oil pan. There was smoke under the hood. The contact was adding coolant daily. The contact called the local dealer, but the vehicle was not diagnosed or repaired. The manufacturer was contacted but no additional assistance was provided. The failure mileage was approximately 70,000.

**2019 Land Rover Range Rover Velar**

a.  **DATE OF INCIDENT:** September 13, 2019
**DATE COMPLAINT FILED:** September 20, 2019
**NHTSA/ODI ID:** 11256814
**SUMMARY:** ON SEPTEMBER 13, 2019, MY WIFE AND 2 YEAR OLD DAUGHTER PULLED INTO OUR DRIVEWAY IN OUR 2019 RANGE ROVER VELAR. SHORTLY BEFORE PULLING INTO THE DRIVEWAY, THE CHECK ENGINE LIGHT CAME ON AND A COOLANT ALERT WENT OFF. THE CAR THEN BURST INTO FLAMES WHILE PARKED IN OUR DRIVEWAY. MY WIFE QUICKLY GOT OUR DAUGHTER OUT OF HER CAR SEAT AND RAN ACROSS THE STREET TO CALL 911. JUST AS SHE GOT TO THE OTHER SIDE OF THE STREET, THE CAR EXPLODED. SEE ATTACHED PICTURES. *PLEASE NOTE: THIS FORM WAS FILLED OUT ON BEHALF OF OWNER BY COUNSEL.

b.  **DATE OF INCIDENT:** September 13, 2019
**DATE COMPLAINT FILED:** September 20, 2019
**NHTSA/ODI ID:** 11256814
**SUMMARY:** ON SEPTEMBER 13, 2019, MY WIFE AND 2 YEAR OLD DAUGHTER PULLED INTO OUR DRIVEWAY IN OUR 2019 RANGE ROVER VELAR. SHORTLY BEFORE PULLING INTO THE DRIVEWAY, THE CHECK ENGINE LIGHT CAME ON AND

A COOLANT ALERT WENT OFF. THE CAR THEN BURST INTO FLAMES WHILE PARKED IN OUR DRIVEWAY. MY WIFE QUICKLY GOT OUR DAUGHTER OUT OF HER CAR SEAT AND RAN ACROSS THE STREET TO CALL 911. JUST AS SHE GOT TO THE OTHER SIDE OF THE STREET, THE CAR EXPLODED. SEE ATTACHED PICTURES. *PLEASE NOTE: THIS FORM WAS FILLED OUT ON BEHALF OF OWNER BY COUNSEL.

**2018      Land Rover Range Rover**

a.  **DATE OF INCIDENT:** February 20, 2022
**DATE COMPLAINT FILED:** March 2, 2022
**NHTSA/ODI ID:** 11454831
**SUMMARY:** ONE OR MORE RIGID PIPES IN THE COOLANT SYSTEM FAILED WHEN DRIVING DOWN THE INTERSTATE. THIS RESULTED IN ALMOST IMMEDIATE OVERHEATING AND THE COMPUTER CURTAILED ENGINE POWER, APPARENTLY TO PREVENT PERMANENT ENGINE DAMAGE. THIS WAS VERY DANGEROUS, AS I WAS IN HEAVY 80+ MPH TRAFFIC AND LOST POWER BEFORE I COULD PULL OFF ONTO THE SHOULDER. THIS IS APPARENTLY A COMMON PROBLEM, AS THE RIGID PIPES SEPARATE AT THE MANUFACTURING SEAM. I WAS STILL UNDER WARRANTY, AND LAND ROVER HAD US TOWED TO THE CLOSEST DEALER WHICH WAS 75 MILES AWAY. THAT DEALER TOLD ME THEY HAD TWO OTHER LAND ROVERS IN THE SHOP WITH THE SAME IDENTICAL PROBLEM, AND THAT THESE PIPES FAIL "BY 50,000 MILES EVERY TIME" (I WAS AT 47,500 MILES). THE PIPES IN QUESTION ARE ON ALL THE 5.0 LITER V8'S USED IN LAND ROVER AND JAGUAR PRODUCTS, BUT THE FAILURE SEEMS MORE COMMON ON SUPERCHARGED VERSIONS OF THE V8 (WHICH I HAVE). THE PIPES ARE UNDER THE SUPERCHARGER AND SUBJECTED TO EXCESSIVE HEAT/COOL CYCLING WHICH LEADS TO FAILURE.

b.  **DATE OF INCIDENT:** September 13, 2019
**DATE COMPLAINT FILED:** September 20, 2019
**NHTSA/ODI ID:** 11256814
**SUMMARY:** ON SEPTEMBER 13, 2019, MY WIFE AND 2 YEAR

OLD DAUGHTER PULLED INTO OUR DRIVEWAY IN OUR 2019 RANGE ROVER VELAR. SHORTLY BEFORE PULLING INTO THE DRIVEWAY, THE CHECK ENGINE LIGHT CAME ON AND A COOLANT ALERT WENT OFF. THE CAR THEN BURST INTO FLAMES WHILE PARKED IN OUR DRIVEWAY. MY WIFE QUICKLY GOT OUR DAUGHTER OUT OF HER CAR SEAT AND RAN ACROSS THE STREET TO CALL 911. JUST AS SHE GOT TO THE OTHER SIDE OF THE STREET, THE CAR EXPLODED. SEE ATTACHED PICTURES. *PLEASE NOTE: THIS FORM WAS FILLED OUT ON BEHALF OF OWNER BY COUNSEL.

### Customer Complaints on Third-Party Websites

46.    Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendant's awareness of the problems with the radiator and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendant themselves, but also because JLRNA employ staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

47.    On discoverysport.net, a consumer of a 2019 Land Rover Discovery Sport posted the following:

[…] I have a 2019 Discovery Sport which i bought 12 months ago.

It has been into the land rover garage about 5 times this year as a result of the coolant water warning light coming on and the coolant levels being low. they have replaced hoses, changed sensors but the problem still occurs. I drive for about 1000 miles and the problem occurs. i am sure i smell something strange when i stop driving like a burning type smell (not sure what that is) I live in the UK so temperatures aren't warm.

the car also had previous problems with leaking gearbox oil and it has been in at least 3 times with that and they have replaced seals etc. i am not a car person but i did wonder if the gearbox is heating up because it has lost a lot of its oil (and they haven't filled it up because i understand there is no level gauge for it) and the heat from the gearbox is causing the coolant water to heat to a point that it is venting off over a period of time. i noted from another thread that the expansion tank vents to air.

does anyone out there have any thoughts? i feel the car dealership are just trying to ignore the problem as i only have 6 months extended warranty left on the car and after that it will be my problem.

earlier this month it went in because the level went low again and they said they couldn't find the leak or problem so topped it up and gave me it back.

would really like to be able to go to them with the possible things

for them to look at (although i know that is meant to be their job!)

[…]

48.    On landroverforums.net, a consumer of a 2022 Land Rover Defender

posted the following:

Well, this is interesting. My dealership service advisor informed me that he's seen a lot of 6 cyl Defenders with leaks at the upper radiator hose to the thermostat housing (mine is a 2022). Was surprised that mine lasted as long as it did with 65k miles. The repair included the replacement of the by-pass tube. No recalls on this but supposedly, the replacement part has been redesigned. For those of us who out of warranty like me, he suggested the best chance for relief is to be on the watch for a class action suit. He tells me he's seen this before when there are a lot of failures, but no recall.

49.    On the r/LandRoverDiscovery forum on reddit.com, a consumer of a

2019 Land Rover Discovery Sport posted the following:

Hi everyone, my 2019 Discovery Sport has been leaking coolant and I have been told I need to replace my front radiator for a price tag of 2k. I have been replacing coolant at the rate of 2 jugs a week, but the mechanic told me it appears to be a slow leak. I don't have the cash for the repair currently. I plan to shop around to find a better price, but in the meantime, does anyone have a suggestion of what I can do to prevent damage to the car while driving with this issue, other than

obviously keeping the coolant topped off. I'm a single mom on limited income and don't know a lot about car stuff. Appreciate any suggestions or help on how to proceed. Thanks y'all

## DEFENDANT HAD SUPERIOR AND EXCLUSIVE KNOWLEDGE OF THE RADIATOR DEFECT

50.    Defendant had superior and exclusive knowledge of the Radiator Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles.

51.    Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiff and Class Members the Defect in Class Vehicles, even though Defendant knew or should have known of the design, material, manufacturing, and/or workmanship defects in the Class Vehicles.

52.    Discovery will show that before Plaintiff purchased his Class Vehicle, and since at least 2018, Defendant knew about the Radiator Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendant and its dealers who are its agents for vehicle repairs, consumer complaints regarding earlier model years equipped with the same radiator assemblies, testing conducted in response to those complaints, high failure rates and replacement part sales data, consumer complaints to NHTSA (which Defendant monitors), by developing TSBs in an effort to address the Radiator Defect, and through other aggregate data from Defendant's dealers about the problem. TSBs are issued exclusively to Defendant's dealerships and service providers and are not

disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

53.    Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, on incoming components, including the Radiator and radiator assembly, to verify the parts are free from defect and align with Defendant's specifications. Thus, Defendant knew or should have known the radiator was defective and prone to putting drivers in a dangerous position due to the inherent risks of the Radiator Defect.

54.    Additionally, discovery will show that Defendant knew of the impact of this defect from the sheer number of reports received from dealerships. Defendant's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the defect, which led to the release of TSBs and dealer communications. Defendant's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

55.    Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Defendant with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to

provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

56.    When the Class Vehicles were first beginning to be sold, Defendant knew or should have known that the Assemblies were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including engine failure.

57.    Indeed, beginning in or around May 2020, JLRNA issued Manufacturer Communication No. SFCC_MAY2020_29 for 2018-2021 Land Rover Range Rover Velar vehicles, as well as certain Jaguar-branded vehicles, titled "Latest Vehicle Concern Fixes" and subheading "Coolant Leak." The Manufacturer Communication states that the "leak is identified from JX73 8C362 AC," which, upon information and belief, identifies a Land Rover radiator coolant hose. The Manufacturer Communication directs authorized dealership personnel to gather "additional data from a vehicle **before** the hose is replaced." (emphasis in original). JLRNA issued two additional, similar Manufacturer Communications thereafter.

58.    In or around January 2021, JLRNA issued a service action, TSB No. JLRTB02027NAS1 for 2018-2020 Land Rover Range Rover Velar vehicles as well as certain Jaguar-branded vehicles, ostensibly providing information on "'Coolant Level Low' Message Displayed On The Instrument Panel Cluster (IPC)." The TSB identifies the cause of the issue as "[f]lexing of the auxiliary radiator assembly within the mounting structure is causing cracking, resulting in an engine coolant leak."

59.    In or around November 2022, JLRNA issued Special Service Message No. SSM75869 for 2018-2023 Land Rover Range Rover Velar, 2014-2023 Land

Rover Range Rover Sport, 2020-2023 Land Rover Defender, 2017-2023 Land Rover Discovery, and 2013-2023 Land Rover Range Rover vehicles titled "'Coolant Low' warning displayed in the Instrument Cluster" with an unknown cause. In or around August 2023, JLRNA updated Special Service Message No. SSM75869 to include 2024 Land Rover Velar, 2024 Land Rover Range Rover, and 2024 Land Rover Range Rover Sport vehicles.

60.    In or around November 2022, JLRNA issued another service action, TSB No. JLRTB02027NAS3, superseding TSB No. JLRTB02027NAS2/2022 for 2018-2020 Land Rover Range Rover Velar vehicles as well as certain Jaguar-branded vehicles, ostensibly providing additional information on "'Coolant Level Low' Message Displayed On The Instrument Panel Cluster (IPC)." As in the year prior, the TSB identifies the cause of the issue as "[f]lexing of the auxiliary radiator assembly within the mounting structure is causing cracking, resulting in an engine coolant leak."

61.    Discovery will show that the problem persists despite the aforementioned Manufacturer Communications and is a result of the Defect as described herein.

62.    Discovery will show that each type of Manufacturer Communication issued by Defendant was approved by managers, directors, and/or executives at JLRNA. Therefore, discovery will show that Defendant's managers, directors, and/or executives knew, or should have known, about the Radiator Defect, but refused to disclose the Radiator Defect to prospective purchasers and owners, and/or actively concealed the Radiator Defect.

63.     The existence of the Radiator Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class Members known of the Radiator Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

64.     Reasonable consumers, like Plaintiff, expect that a vehicle's Radiator and related components are safe, will function in a manner that will not pose a safety risk, and are free from defects. Plaintiff and Class Members further reasonably expect that Defendant will not sell or lease vehicles with known safety defects, such as the Radiator Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendant to conceal and fail to disclose the Radiator Defect to them, and to then continually deny its existence.

**DEFENDANT'S OMISSIONS AND MISREPRESENTATIONS REGARDING THE CLASS VEHICLES**

65.     Notwithstanding JLRNA's knowledge of the Defect, JLRNA touted the ability of the Class Vehicles to be driven reliably. The most basic task of any vehicle is to provide transportation, but JLRNA failed to disclose the Defect interfered with that purpose in any of its statements about the Class Vehicles, including in brochures, Moroney Stickers, warranty booklets, and owner's manuals. JLRNA's statements about the Class Vehicles consistently touted the safety and performance of the vehicles, without mentioning the Defect which had an associated safety risk and negative effect on the fuel economy possible in the vehicles.

66.     For example, in the 2022 Range Rover Press Kit, JLRNA stated, "[t]he New Range Rover maintains its rich bloodline of pioneering innovation with a suite of technologies designed to effortlessly enhance convenience, efficiency, refinement and safety."   Similarly, the 2023 Range Rover Sport Press Kit, advertises the performance of the vehicle, stating that the "[n]ew Range Rover Sport redefines sporting luxury, effortlessly combining assertive and instinctive on-road performance with trademark Range Rover refinement, progressive design sophistication and connected convenience."   At no point did in the press kits did JLRNA acknowledge that the Defect could performance of a vehicle's Radiator, causing a material safety concern.

67.     In fact, JLRNA extolled in its customer brochures that its vehicles were equipped with many safety features, including a unique infotainment system, an integrated Amazon Alexa, high-performance brakes, LED headlights, and several advanced driver assistance systems, including smart camera technology.

68.     JLNRA failed, however, to mention the greatest safety risks of the vehicle, including the Defect, either in the brochure itself or in the owner's manual to which the brochure directed consumers to read "further details and important limitations."

69.     JLRNA had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a serious defect that could not only affect the ability of the cars to be driven, but also carried a significant associated safety risk of coolant leaking out of the vehicle, causing engine overheating, stalling, and potentially failing which in turn increases the likelihood of collision with

pedestrians, animals, inanimate objects, and road hazards. But none of the statements that JLRNA published and distributed about the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

70.    JLRNA further touts the Class Vehicles and makes other express representations and warranties about their quality, durability, and performance. However, in truth, JLRNA knew before selling the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had JLRNA disclosed that knowledge, Plaintiff and Class Members would not have purchased their vehicles or would not have purchased them for the same price.

**DEFENDANT HAS ACTIVELY CONCEALED THE RADIATOR DEFECT**

71.    Despite their knowledge of the Radiator Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the defect from Plaintiff and Class Members. Specifically, Defendant failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a. any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the radiator assemblies;

b. that the Class Vehicles, including the radiator assemblies, were not in good working order, were defective, and were not fit for their intended purposes; and

c.  that the Class Vehicles and their radiator assemblies were defective, despite the fact that Defendant learned of such defects such defects as early as 2018, if not earlier.

72.     Discovery will show that when consumers present their Class Vehicles to an authorized Defendant's dealer for Radiator repairs, rather than repair the problem under warranty, Defendant's dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Radiator Defect.

73.     Defendant has caused Plaintiff and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Radiator and/or related components, despite Defendant's knowledge of the Radiator Defect.

74.     As a result, Class Members continue to experience the Defect despite having repairs, as shown by the experiences of Plaintiff. Because many Class Members, like Plaintiff, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient.

75.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

76.     As a result of the Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

**DEFENDANT HAS UNJUSTLY RETAINED A SUBSTANTIAL BENEFIT**

77.     Discovery will show that Defendant unlawfully failed to disclose the alleged defect to induce Plaintiff and other putative Class Members to purchase or lease the Class Vehicles.

78.     Plaintiff further alleges that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff's purchase of his Class Vehicle.

79.     As discussed above, therefore, Plaintiff alleges that Defendant unlawfully induced him to purchase his Class Vehicle by concealing a material fact (the defective Radiator) and that he would have paid less for the Class Vehicle, or not purchased it at all, had he known of the defect.

80.     Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

**THE AGENCY RELATIONSHIP REGARDING THE VEHICLE WARRANTIES BETWEEN DEFENDANT JLRNA AND ITS AUTHORIZED DEALERS**

81.     In order to sell vehicles to the general public, Defendant JLRNA enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff while also advertising the warranties provided by JLRNA directly to consumers when they purchase a Land Rover-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in JLRNA's stead to provide repairs under the warranties JLRNA provide directly to consumers. Accordingly, discovery will show, particularly the

dealership agreements between Defendant and third-party dealerships, that Defendant has authorized these dealerships to be its agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendant. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

82.    Further, Plaintiff and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by JLRNA. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

83.    JLRNA issued the express warranty to Plaintiff and the Class Members. JLRNA also developed and disseminated the owner's manuals and warranty booklets which direct consumers to take their vehicles to authorized dealerships for

diagnosis and repair. JLRNA also developed and disseminated the advertisements such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle. JLRNA are also responsible for the content of the Monroney Stickers on their vehicles. Because they issue the express warranties directly to the consumers, the consumers are in direct privity with JLRNA with respect to the warranties.

84.    In promoting, selling, and repairing their defective vehicles, Defendant acts through numerous authorized dealers who act as, and represent themselves to the public as exclusive Land Rover representatives and agents, particularly for the purpose of providing repairs that are the responsibility of JLRNA to provide under their respective warranties. That the dealers act as Defendant's agents for this purpose is demonstrated by the following facts:

 a. The authorized dealerships complete all service and repair according to instructions disseminated directly to them by JLRNA, including service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents drafted by JLRNA;

 b. Technicians at Defendant's dealerships are required to go to at least yearly JLRNA-given trainings in order to remain certified to work on Land Rover-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by-step instructions on diagnosing and repairing Land Rover-branded vehicles;

c. Consumers are able to receive services under JLRNA's issued New Vehicle Limited Warranties only at authorized dealerships, and they are able to receive these services because of the agreements between JLRNA and the authorized dealers. These agreements provide JLRNA with a significant amount of control over the actions of the authorized dealerships;

d. The warranties provided by JLRNA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e. JLRNA control the way in which their authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with JLRNA's authorization;

f. JLRNA has entered into agreements and understandings with its authorized dealers pursuant to which they authorize and exercise substantial control over the operations of their dealers and the dealers' interaction with the public, particularly the advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

g. JLRNA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Land

Rover dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

85.     Indeed, JLRNA's warranty documents make it abundantly clear that only their authorized dealerships are their agents for warranty service. The documents, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, "Under the warranty, it is agreed that the sole exclusive remedy against JLR, and their retailer/authorized repairers shall be for the repair or replacement of defective parts as provided herein. The sole purpose of this exclusive remedy shall be to provide for the free repair and replacement of defective parts in the manner prescribed in this warranty. This exclusive remedy shall not be deemed to have failed its essential purpose so long as JLR, through their retailer/authorized repairers, are willing and able to repair or replace defective parts in the prescribed manner."

86.     Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant for the purposes of the warranties, which are direct contracts between JLRNA and the purchasers of their branded vehicles. Plaintiff and each of the members of the Class have had sufficient direct dealings with either JLRNA or their agent dealerships to establish privity of contract between JLRNA, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiff and Defendant. It also establishes that Plaintiff was dealing with Defendant through its authorized agent dealerships when they were given the New

31

Vehicle Limited Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

## DEFENDANT'S WARRANTIES ARE UNCONSCIONABLE

87.    Plaintiff signed a contract for sale with Defendant's authorized dealer, and with that sale, was presented with a separate Warranty as drafted by JLRNA. While Plaintiff had some ability to negotiate price of the vehicle, he had no ability to negotiate the terms of the Warranty. Plaintiff had no bargaining power with respect to the Warranty, was presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to him. Plaintiff had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored JLRNA over Plaintiff and the members of the Class; a gross disparity in bargaining power existed as between JLRNA and Class Members; and JLRNA knew or should have known that the Radiator Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

88.    JLRNA drafted the terms of the Warranty in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiff and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiff's acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. JLRNA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely

solely because of a defect in design, materials, and workmanship, to wit, the Radiator Defect. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored JLRNA over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

89.    Defendant's exclusive superior knowledge of the existence of the Defect and when it would manifest influenced its analysis of the Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

90.    Plaintiff was also not aware and could not have been aware that JLRNA would willfully not inform him of the Defect which affects the safety of their vehicles and that the Defect could manifest outside of the durational limit of the Warranty, despite Defendant's knowledge of this. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment

91.    As previously described, any applicable statute(s) of limitations has been tolled by JLRNA's knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

92.    JLRNA was and remains under the continuing duty to disclose to Plaintiff and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by JLRNA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

93.    JLRNA has known of the Defect in the Class Vehicles since at least 2020, and has concealed from, or failed to, notify Plaintiff, Class Members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiff and Class Members during communications with JLRNA, JLRNA Customer Assistance, JLRNA dealerships, and JLRNA service centers.  JLRNA continues to conceal the Defect to this day.

### B.    Estoppel

94.    JLRNA was, and is, under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles.  JLRNA

actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiff and Class Members reasonably relied upon JLRNA's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, JLRNA is estopped from relying on any statutes of limitation in defense of this action.

### C.    Discovery Rule

95.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles suffered from the Defect.

96.    However, Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused Class Vehicles' radiator, radiator coolant hose, and related components to need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty.

97.    Even then, Plaintiff and Class Members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of JLRNA's active concealment of the Defect. Not only did JLRNA fail to notify Plaintiff or Class Members about the Defect, but also JLRNA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

98.    Thus, Plaintiff and Class Members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest,

they discovered that the Defect was causing the Class Vehicles' radiator, radiator coolant hose, and related components to need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty.

## EQUITABLE RELIEF IS NECESSARY

99.    Recourse to the equitable powers of the Court, and relief in equity, is necessary here in order to provide complete, practical, prompt, and efficient relief to Class Members. This is particularly true given that, as a practical matter for the class, receiving a fix to their vehicles during their ownership of them is of critical importance.

100.  First, Plaintiff, on behalf of himself and the Class Members, seeks equitable relief in this matter in the form of prospective injunctive relief.

101.  Plaintiff seeks an injunction requiring JLRNA issue a prompt, complete, effective, and supervised recall of all Class Vehicles providing a prompt, complete, and effective repair of the Defect and all related components unduly worn or damaged due to the defect's presence.

102.  Additionally, Plaintiff seeks an injunction requiring JLRNA to provide fulsome and comprehensive notice to each Class Member regarding the existence of the Defect in their vehicles, JLRNA's knowledge thereof, the attendant risks to vehicle componentry, the attendant safety concerns and risks, and the availability of any relief available, including through the above-referenced prompt, complete, and effective recall. JLRNA sends notice of the recall to only a limited group of current owners; JLRNA should be compelled to provide notice to every current and former registered owner of the Class Vehicles.

103.   To that end, Plaintiff seeks an injunction requiring JLRNA to acquire the contact information, including addresses for direct mail notice, associated with each Class Vehicle's VIN number, from the Departments of Motor Vehicles of the fifty states, which is done routinely in connection with class certification in automotive defect cases, and to send direct-mail notice containing the above-referenced disclosures to each Class Member, including current owners or lessees, former owners or lessees, and former owners/lessees who disposed of their vehicles due to the existence of the Defect.

104.   Unless restrained by this Court and supervised by putative Class Counsel, JLRNA will not provide the prompt, complete, and effective recall discussed *supra*. JLRNA will not acquire the addresses of all Class Members, including current and former owners/lessees, from the Departments of Motor Vehicles of the fifty states. JLRNA will not send direct mail notice with complete disclosures regarding its knowledge of the Defect, its effect on the vehicles' componentry, its attendant safety risks, and the availability of a prompt, complete, and effective recall fixing the Defect in all Class Vehicles and fixing related componentry prematurely worn or otherwise damaged by the Defect's effects.

105.   Plaintiff further seeks an injunction requiring JLRNA to provide reimbursement for all costs of repair and related costs, such as towing, rental cars, and other costs, and to require that such reimbursement claims be handled by an independent third-party administrator to ensure fairness and efficiency.

106. Legal remedies are inadequate to obtain the above-referenced outcomes, including fulsome and complete notice to all Class Members, including

notice of the active and ongoing downstream mechanical effects of the unrepaired Defect and notice of the defect's safety risks. Nor are legal remedies adequate to compel JLRNA to devise a prompt, complete, and effective recall and/or fix that can be applied to each Class Vehicle. Nor are legal remedies equally as prompt, certain, and in other ways efficient to provide notice to the Class Members and a fulsome and prompt recall and/or fix to their vehicles.

107.   Likewise, Plaintiff seeks equitable relief in the form of restitution, credit-repair, and other compensation for Class Members who, because of the high anticipated cost of replacing their engine and related components damaged by the Defect instead head to sell or trade in their vehicles at a significant loss, who had the vehicle repossessed, or who were forced to continue making payments on a non-functioning vehicle.

108.   As with the injunctive relief discussed *supra*, legal remedies are likewise inadequate and are not as equally prompt, certain, and in other ways efficient as restitution under California's Unfair Competition Law. For example, the legal remedies available to Plaintiff for his breach of express warranty claim may require that Plaintiff shows that he presented his vehicle to a JLRNA dealership for repair before the expiration of the vehicle's 50,000-mile warranty. Such elements are not required for Plaintiff to recover restitution under his California Unfair Competition Law claims.

109.   Similarly, the legal remedies available to Plaintiff for his common law fraud claim are likewise inadequate and are not as equally prompt, certain, and in other ways efficient as restitution under California's Unfair Competition Law. To

prevail on his Common Law Fraud claims, Plaintiff may need to show intent and actual reliance. Such elements are not required for Plaintiff to recover restitution under his California Unfair Competition Law claims.

110. Additionally, in furtherance of the foregoing, Plaintiff seeks specific performance to require JLRNA to perform and repair the Defect according to the warranty and declaratory relief as to Plaintiff's right to receive such repairs to the Defect under the warranty.

111. Finally, Plaintiff seeks, and is entitled to seek, remedies in the alternative at the pleading stage. At this early stage of litigation, it is unclear which claims will be certified and brought at trial.

## CLASS ACTION ALLEGATIONS

112. Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

113. The Class and Sub-Classes are defined as:

**Class**: All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of California.

**CLRA Sub-Class**: All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

114. Excluded from the Class and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

115. Numerosity: Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

116. Typicality: Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendant. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Radiator and/or its components. Furthermore, the factual bases of Defendant's misconduct are

common to all Class Members and represent a common thread resulting in injury to the Class.

117.   Commonality:  There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting Class Members individually.  These common legal and factual issues include the following:

a.   Whether Class Vehicles suffer from defects relating to the Radiator;

b.   Whether the defects relating to the Radiator constitute an unreasonable safety risk;

c.   Whether Defendant knew about the defects pertaining to the Radiator and, if so, how long Defendant has known of the defect;

d.   Whether the defective nature of the Radiator constitutes a material fact;

e.   Whether Defendant has had an ongoing duty to disclose the defective nature of the Radiator to Plaintiff and Class Members;

f.   Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

g.   Whether Defendant knew or reasonably should have known of the defects pertaining to the Radiator before they sold and leased Class Vehicles to Class Members;

h.   Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Radiator and/or its components;

i.   Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose,

repair, or replace their defective Radiator and/or its components;

j.   Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

k.   Whether Defendant breached the implied warranty of merchantability under California law;

l.   Whether Defendant breached their express warranties under California Law; and

m.   Whether Defendant breached express warranties pursuant to the Magnuson-Moss Warranty Act.

118.   <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to vigorously prosecute this action.

119.   <u>Predominance and Superiority</u>:  Plaintiff and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or

piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

<u>COUNT I</u>
**BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS
WARRANTY ACT
(15 U.S.C. § 2303, *et seq*.)**
**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All
Sub-Classes Against Defendant, or, in the Alternative, on Behalf of Himself in
His Individual Capacity Against Defendant)**

120.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

121.    Plaintiff brings this count on behalf of himself and the Class and/or appropriate Sub-Class, or alternatively on behalf of himself in his individual capacity against Defendant.

122.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

123.    Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

124.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

125.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

126.    JLRNA provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

127.    The radiator and its component parts were manufactured and/or installed in the Class Vehicles by JLRNA and are covered by the express warranty.

128.    In a section entitled "New Vehicle Limited Warranty," JLRNA's express warranty, the "New Vehicle Limited Warranty," provides, in relevant part, that JLRNA will provide warranty services when the vehicle is brought to an authorized JLRNA retailer. The authorized JLRNA retailer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts.

129.    JLRNA breached the express warranties by selling and leasing Class Vehicles with radiators that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the engine and its component parts. JLRNA have failed to "repair" the defects as alleged herein.

130.    Plaintiff was not required to notify JLRNA of the breach or was not required to do so because affording JLRNA a reasonable opportunity to cure its breach of written warranty would have been futile. JLRNA was also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the radiator, and from other internal sources.

131.    Plaintiff also provided notice to JLRNA of its breach of warranty claims under the JLRNA by letter dated July 17, 2024.

132.    As a direct and proximate cause of JLRNA's breach, Plaintiff and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other

Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

133.   Plaintiff and the other Class Members are entitled to legal and equitable relief against JLRNA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT II
## BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2303 *et seq*.)
**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant, or, in the Alternative, on Behalf of Himself in His Individual Capacity Against Defendant)**

134.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

135.   JLRNA impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their radiators manufactured, supplied, distributed, and/or sold by JLRNA would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their radiators would be fit for their intended use while the Class Vehicles were being operated.

136.   Contrary to the applicable implied warranties, the Class Vehicles and their radiators at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design and materials of their radiators.

137.    JLRNA's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

138.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

139.    JLRNA has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and radiator repair.

140.    As a direct and proximate cause of JLRNA's breach of implied warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. JLRNA's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

141.    As a result of JLRNA's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

142.    Plaintiff also provided notice to JLRNA of its breach of warranty claims under the JLRNA by letters dated July 17, 2024.

## COUNT III
## UNJUST ENRICHMENT
## (On Behalf of the Class, or in the Alternative, on Behalf of the California Sub-Class Against Defendant)

143.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

144.   Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf of the California Sub-Class.

145.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased and leased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

146.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

147.   Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

148.   As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

149.    Plaintiff does not seek restitution under their Unjust Enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

150.    Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class Members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT IV
## FOR FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT
**(On Behalf of the Class, or in the Alternative, on Behalf of the California Sub-Class Against Defendant)**

151.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

152.    Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf of the California Sub-Class.

153. Defendant knew that the Class Vehicles suffered from an inherent Radiator Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

154. Defendant concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

155. Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

a. Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b. The omitted facts were material because they directly impact the safety of the Class Vehicles;

c. Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

d. Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e. Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

156. The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Had Plaintiff and Class Members known

about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

157.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

158.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

159.    As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Class Vehicles and recover damages.

160.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT V
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq*.)
### (On Behalf of the Class, or in the Alternative, on Behalf of the California Sub-Class Against Defendant)

161. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

162. Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf of the California Sub-Class.

163. California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." JLRNA engaged in conduct that violated each of this statute's three prongs.

164. JLRNA committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged below.

165. JLRNA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., because the acts and practices described herein, including but not limited to JLRNA's failure to provide a permanent remedy to fix the Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members. JLRNA's acts and practices were additionally unfair because the harm to Plaintiff and California Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, JLRNA's acts and

practices were unfair in that they were contrary to legislatively declared or public policy.

166.   JLRNA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it concealed the existence and nature of the Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe when, in fact, the Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. JLRNA's representations, omissions, and active concealments about the Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

167.   JLRNA's unfair or deceptive acts or practices occurred repeatedly in the course of JLRNA's trade or business and were likely to mislead a substantial portion of the purchasing public.

168.   Plaintiff relied on JLRNA's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

169.   As a direct and proximate result of JLRNA's unfair, unlawful, and deceptive practices, Plaintiff has lost money.

170.   Plaintiff would consider purchasing or leasing similar JLRNA vehicles in the future if he could rely on JLRNA's representations regarding the vehicles.

171.   Plaintiff and Class Members seek an order enjoining JLRNA from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

## COUNT VI
## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (California Civil Code § 1750, *et seq*.)
### (On Behalf of the Class, or in the Alternative, on Behalf of the CLRA Sub-Class Against Defendant)

172.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

173.   Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf of the CLRA Sub-Class.

174.   JLRNA is a "person" as defined by California Civil Code § 1761(c).

175.   Plaintiff and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

176.   The purchase and leases of Class Vehicles by Plaintiff and the CLRA Class Members constitute "transactions" as defined by the Cal. Civ. Code § 1761(e).

177.   The Class Vehicles constitute "goods" or "services" as defined by Cal. Civ. Code § 1761(a) and (b).

178.   Plaintiff and the Class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

179.   JLRNA's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the California's Consumers Legal Remedies Act ("CLRA") in the following ways:

       a.     JLRNA misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

b.  JLRNA misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.  JLRNA advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d.  JLRNA misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code § 1770(a)(14)); and

e.  JLRNA misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

180.  JLRNA repeatedly engaged in these unfair and deceptive acts or practices in the course of its business. The acts or practices were material, capable of deceiving a substantial portion of the purchasing public and caused economic harm to the purchasers and lessees of the Class Vehicles, including the Plaintiff.

181.  JLRNA participated in unfair or deceptive trade practices that violated the CLRA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, JLRNA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. JLRNA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

182.    JLRNA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

183.    JLRNA's unfair and deceptive acts or practices occurred repeatedly in JLRNA's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

184.    JLRNA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

185.    JLRNA knew or should have known that its conduct violated the CLRA.

186.    JLRNA was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles because:

a.    JLRNA was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.    JLRNA made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.    JLRNA actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members at the time of sale and thereafter.

187.   By failing to disclose the Defect, JLRNA knowingly and intentionally concealed material facts and breached its duty not to do so.

188.   The facts concealed or not disclosed by JLRNA to Plaintiff and the Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease JLRNA's Class Vehicles, or to pay less for them. Whether a vehicle's radiator and/or related components are defective is a material safety concern. Had Plaintiff and the Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

189.   Plaintiff and the Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

190.   As a result of JLRNA's misconduct, Plaintiff and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

191.   As a direct and proximate result of JLRNA's unfair or deceptive acts or practices, Plaintiff and the Class Members have suffered and will continue to suffer actual damages.

192.   JLRNA's violations present a continuing risk to Plaintiff and the Class Members as well as to the general public. JLRNA's unlawful acts and practices complained of herein affect the public interest.

193.   Plaintiff seeks to recover actual damages, an order enjoining JLRNA's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

194.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), on July 17, 2024, Plaintiff's counsel served JLRNA with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff and Class Members and demanded that JLRNA, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. JLRNA did not respond or otherwise correct the actions described therein, and did not reimburse associated out-of-pocket costs, or otherwise remedy the harm alleged.

195.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiff, individually and on behalf of the CLRA Subclass, seeks injunctive relief for JLRNA's violations of the CLRA. Absent an order from the court enjoining JLRNA from selling the Class Vehicles without disclosing the defect, an order requiring JLRNA to issue an adequate recall with a prompt and complete repair, and other similar injunctive relief requested in the Remedies section of this complaint, infra, JLRNA will continue these violations.

## COUNT VII
### BREACH OF IMPLIED WARRANTY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT
### (California Civil Code § 1792 & 1791.1, *et seq*.)
### (On Behalf of the Class, or in the Alternative, on Behalf of the California Sub-Class Against Defendant)

196.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

197.   Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf the California Sub-Class.

198.   JLRNA was and is at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. JLRNA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

199.   JLRNA provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from an inherent defect in the radiator and/or related components at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

200.   JLRNA impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles, which were manufactured, supplied, distributed, and/or sold by JLRNA, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use.

201.   Contrary to the applicable implied warranties, the Class Vehicles and their rear subframes at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the California Class Members with

reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the rear subframe.

202.   The Defect is inherent and was present in each Class Vehicle at the time of sale.

203.   As a result of JLRNA's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' rear subframe and/or its components are substantially certain to fail before their expected useful life has run.

204.   JLRNA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## <u>COUNT VIII</u>
## FOR DECLARATORY AND INJUNCTIVE RELIEF

205.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

206.   As illustrated in the foregoing allegations, there is an actual controversy between JLRNA and Plaintiff concerning: (1) whether the radiator and related components found in Class Vehicles is defectively designed and manufactured; (2) whether JLRNA knew, or should have known, of that Defect; (3) whether JLRNA knew, or should have known, that the Defect would impact the safety and performance of the Class Vehicles.

207.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

208.   Plaintiff asks this Court for an order enjoining JLRNA from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling JLRNA to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling JLRNA to repair and eliminate the Radiator Defect from every Class Vehicle; enjoining JLRNA from selling the Class Vehicles with the misleading information; and/or compelling JLRNA to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiff, the Class and all Sub-Classes, and award the following relief:

A.   A declaration that any applicable statutes of limitations are tolled due to Defendant's fraudulent concealment and that Defendant is estopped from relying on any statutes of limitations in defense;

B.   A declaration that Defendant is financially responsible for notifying all Class Members of the Radiator Defect;

C.   An order enjoining Defendant from further deceptive distribution,

sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Radiator Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D.    Damages and restitution in an amount to be proven at trial;

E.    An order certifying the proposed Class and Sub-Classes, designating Plaintiff named representative of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

F.    Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

G.    An award to Plaintiff and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

H.    A declaration that Defendant must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiff and Class Members;

I.    An award of reasonable attorneys' fees and costs, as allowed by law;

J.    An award of pre-judgment and post-judgment interest, as provided by law;

K.    Leave to amend the Complaint to conform to the evidence produced at trial; and

L.    Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated: September 16, 2024        BERGER MONTAGUE PC

/s/ Russell D. Paul
Russell D. Paul (NJ Bar No. 037411989)
Jeffrey L. Osterwise (*pro hac vice forthcoming)*
Natalie Lesser (NJ Bar No. 017882010)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:  (215) 875-3000
Fax:  (215) 875-4604
josterwise@bm.net
nlesser@bm.net

Tarek H. Zohdy (*pro hac vice forthcoming*)
Cody R. Padgett (*pro hac vice forthcoming*)
Laura E. Goolsby (*pro hac vice forthcoming*)
Nathan N. Kiyam (*pro hac vice forthcoming*)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067

Tel.:   (310) 556-4811
Fax:    (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

*Attorneys for Plaintiff and the Proposed Classes*