<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr><td>

KENNETH NOWLING, Individually and On Behalf of All Others Similarly Situated, *et al.*,

   *Plaintiffs*,

v.

JAGUAR LAND ROVER NORTH AMERICA LLC,

   *Defendant*.

</td><td>

Civil Action No. 24-09184

**OPINION**

March 30, 2026

</td></tr>
</table>

**SEMPER**, District Judge.

Before the Court is Defendant Jaguar Land Rover North America, LLC's ("Defendant" or "JLRNA") motion to dismiss Plaintiffs' Second Amended Complaint (ECF 52, "SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF 53, "Motion to Dismiss"; ECF 53-2, "MTD Br.") Plaintiffs filed a brief in opposition. (ECF 55, "MTD Opp.") Defendant filed a reply in further support of its Motion to Dismiss. (ECF 59, "MTD Reply.") Also before the Court is Defendant's motion to compel Plaintiff Joseph Ricca's claims to arbitration. (ECF 57, "Motion to Compel Arbitration.") Ricca opposed the Motion to Compel Arbitration. (ECF 61, "MTC Opp.") Defendant filed a reply in further support of the Motion to Compel Arbitration. (ECF 65, "MTC Reply.")

The Court reviewed the parties' submissions and decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons

set forth below, Defendant's Motion to Dismiss is **GRANTED** and Defendant's Motion to Compel

Arbitration is **DENIED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

This putative class action arises from "one or more" alleged radiator defects impacting

certain Land Rover vehicles. Land Rover is a luxury sports car brand. (SAC ¶¶ 2-3.) Plaintiffs

Kenneth Nowling, Melissa Bailey, Nikki Kaloust, Bob Neuss, Jesse Keane, Joseph Ricca, and Bob

McGehee ("Plaintiffs"), all purchased or leased Land Rover vehicles, and now bring this action

against Defendant Jaguar Land Rover North America[2] on behalf of themselves and all those

similarly situated.[3] (*Id.* ¶ 1.) The vehicles at issue in this action include the 2018-2024 Land Rover

Range Rover, 2018-2024 Land Rover Range Rover Velar, 2018-2024 Land Rover Range Rover

Sport, 2018-2024 Land Rover Discovery, and 2020-2024 Land Rover Defender (the "Class

Vehicles"). (*Id*. ¶ 2.)

### A. The Radiator Defect

Plaintiffs assert that "[d]iscovery will show that the Class Vehicles' radiator, radiator hose,

and related components are defective in that they are designed, manufactured, and/or installed in

a manner that causes cracks in the radiator and/or leaks from the radiator hose(s), which lead to

coolant leaking out of the vehicle" (the "Radiator Defect"). (*Id.* ¶ 3.) The Radiator Defect began

appearing in 2018, or potentially earlier, and "increases the risk of the engine overheating, stalling,

and potentially failing" as a result of "1) inadequately designed, manufactured, or installed radiator

---

[1] When considering a motion to dismiss under Rule 12(b)(6), the Court is obligated to accept as true allegations in the complaint and all reasonable inferences that can be drawn therefrom. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). The facts are taken from Plaintiffs' Second Amended Complaint.

[2] Defendant Jaguar Land Rover North America is an automobile manufacturer and distributor incorporated in Delaware with its principal place of business at 100 Jaguar Land Rover Way, Mahwah, New Jersey. (SAC ¶¶ 90-91.) JLRNA enters into agreements with authorized dealerships, who engage in retail sales with consumers and who are permitted to service and repair the vehicles under warranties JLRNA provides directly to consumers. (*Id.* ¶ 92.)

[3] Plaintiff Penelope Cillufo has voluntarily dismissed her claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (ECF 54; ECF 56.)

assemblies; 2) the use of inadequate materials in the radiator assemblies which begin to degrade from the moment the components are exposed to coolant; and/or 3) improper design of the radiator assemblies." (*Id.*)

According to Plaintiffs, the Radiator Defect specifically arises from "defective design and/or manufacturing of the radiator assemblies and their mounting framework" including the "use of inadequately sized auxiliary radiator ducts." (*Id.* ¶ 99.) Radiators "are the main component of vehicle cooling systems" and "keep the engine fluid at the proper level" in the Class Vehicles. (*Id.* ¶ 100.) "Cooling fins inside the radiator cool the engine fluid as it passes over them," and "radiator hoses transport the coolant throughout the engine, cooling the engine." (*Id.*) The coolant absorbs the heat from the engine, flows through a hose into the radiator to cool itself down, and once the temperature has lowered, the "coolant re-circulates" and "continu[es] the cycle." (*Id.*)

In the affected Class Vehicles, "coolant leaks through cracks in the assemblies created by the assemblies' repeated torsion and flexion within the radiator mounting framework, including the auxiliary radiator duct." (*Id.* ¶ 101.) The "auxiliary radiator assemblies in the Class Vehicles are not seated properly within the mounting framework (e.g., the auxiliary radiator ducts) because the mounting framework is inadequately sized and fitted to the Class Vehicles." (*Id.* ¶ 102.) The inadequately sized mounting framework "allows the radiator assemblies to flex and shift within the framework, causing the assembly materials to weaken over time, resulting in cracks" to the assemblies. (*Id.* ¶ 103.) As a result, coolant leaks out of the vehicle, and the engine overheats due to the "insufficient coolant," which can cause "catastrophic damage," "complete engine seizure," and "engine fire." (*Id.* ¶ 104.)

Plaintiffs asserts that "[d]iscovery will show" and "confirm" that all Class Vehicles are defective in "substantially the same manner" and the "Radiator Defect is inherent in, and the same for, all Class Vehicles." (*Id.* ¶¶ 105-107.)

**B. JLRNA's Knowledge, Misrepresentations, Omissions, and Duty to Disclose**

Plaintiffs assert that Defendant had "superior and exclusive knowledge" about the Radiator Defect. (*Id.* ¶ 116.) Plaintiffs also allege that Defendant is experienced in designing vehicles and knew or should have known that the radiator was defective. (*Id.* ¶ 119.) Specifically, Plaintiffs allege that before Plaintiffs purchased their Class Vehicles, and since 2018, Defendant's knowledge was established through avenues unavailable to customers, including (1) pre-release testing data; (2) early consumer complaints to Defendants and its dealers; (3) consumer complaints concerning earlier vehicle models equipped with the same radiator assemblies; (4) testing conducted by Defendant in response to those complaints; (5) high failure rates of the assemblies and replacement part sales data; (6) consumer complaints to the National Highway Traffic Safety Administration ("NHTSA"); (7) developing Technical Service Bulletins ("TSBs") to address the Radiator Defect; (8) aggregate data from the Defendant's dealer about the Radiator Defect (*id.* ¶ 118.); (9) dealer audits; (10) design failure mode analysis; and (11) warranty information. (*Id.* ¶ 9.) In the SAC, Plaintiffs include examples of consumer complaints given by customers on NHTSA's website and third-party Internet forums, which include (1) "coolant water warning light coming on . . . [and having to] replace the hoses" (2019 Land Rover Discovery Sport); (2) "leaks at the upper radiator house" (2022 Land Rover Defender); and (3) "my [vehicle] has been leaking coolant and I have been told I need to replace my front radiator" (2019 Land Rover Discovery Sport). (*Id.* ¶¶ 111-115.)

Additionally, Plaintiffs allege that Defendant knew or should have known of the results of the Radiator Defect through its issuance of several TSBs, which are created from "detailed documentation and complete disclosure of repairs" resulting from numerous repairs at Defendant's dealers. (*Id.* ¶¶ 120-121.) The SAC includes various communications issued by Defendant to its dealers regarding the alleged defect: (1) Manufacturer Communication No. SFCC_MAY2020_29 ("Manufacturer Communication"); (2) TSB No. JLRTB02026NAS1 ("TSB 1"); (3) Special Service Message No. SSM75869 ("Special Service Message" or "SSM"); and (4) TSB No. JLRTB02027NAS3 ("TSB 2"). (*Id.* ¶¶ 122-126.)

Plaintiffs allege that despite Defendant's superior knowledge of the Radiator Defect, the Defendant misrepresented and omitted the Radiator Defect to potential buyers. (*Id.* ¶¶ 4, 117, 130-131-36.) Plaintiffs also allege that the Defendant actively concealed the defect during purchase, lease, or repairs of the Class Vehicles, and "den[ied] the existence of the defect" to "avoid implementing potentially costly repairs for years, or at least until the vehicles are out of warranty." (*Id.* ¶¶ 6-8, 11, 128, 137.) Defendant also allegedly "refused to provide a sufficient repair or replacement of the radiator components, even when a Class Vehicle [was] within the warranty period." (*Id.* ¶ 5.) Plaintiffs lacked knowledge of the Radiator Defect and continue to spend money to repair and Replace Class Vehicles. (*Id.* ¶¶ 129, 139-142.)[4]

**C. The Individual Plaintiffs**

**1. Kenneth Nowling**

---

[4] When conducting Rule 12(b)(6) analysis, the court is not "required to credit bald assertions or legal conclusions improperly alleged in the complaint, and legal conclusions draped in the guise of factual allegations may not benefit from the presumption." *Chemtech Int'l v. Chem. Injection Techs., Inc.*, 274 Fed. Appx. 403, 404-05 (3d Cir. 2007) (citing *in re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Therefore, the following sections have been omitted from the factual and procedural background: (1) Defendant Unjustly Retained a Substantial Benefit (Compl. ¶¶ 143-46), (2) Agency Relationship (*Id.* ¶¶ 147-52); (3) Defendant's Warranties are Unconscionable (*Id.* ¶¶ 153-156); (4) and Tolling of the Statute of Limitations (*Id.* ¶¶ 157-64).

Plaintiff Kenneth Nowling ("Plaintiff Nowling") is a California citizen. (*Id.* ¶ 16.) On April 21, 2023, Plaintiff Nowling purchased a used 2018 Land Rover Range Rover, at Land Rover Riverside, an authorized JLRNA dealership, located in Riverside, California. (*Id.* ¶ 17.) Plaintiff Nowling does not allege that his vehicle came with a warranty. (*See generally id.* ¶¶ 16-23.) Prior to purchasing his class vehicle, Plaintiff Nowling "reviewed the vehicle's CARFAX report and purchase agreement and discussed the vehicle with an authorized JLRNA dealership representative." (*Id.* ¶ 19.) Plaintiff Nowling relied on these representations and believed his vehicle would be safe and reliable since he was never informed of the Radiator Defect. (*Id.* ¶¶ 19-20.)

Around September 2023, Plaintiff Nowling began to experience the Radiator Defect, and took his vehicle to an authorized JLRNA dealership, which performed repairs. (*Id.* ¶ 21.) Around March 2024 and again in May 2024, Plaintiff Nowling took his vehicle to authorized JLRNA dealerships due to leaking coolant, the engine overheating, and the vehicle losing power while driving. (*Id.*)  Nowling paid out of pocket for a repair on "[t]he radiator, fan, gaskets, hoses, and belts [that] needed replacement due to the Defect." (*Id.*)  Plaintiff Nowling's issues remained following these repairs and the dealership confirmed seepage from the "waterpump". (*Id.*)

### 2.  Joseph Ricca

Plaintiff Joseph Ricca ("Plaintiff Ricca") is a New Jersey citizen. (*Id.* ¶ 24.) Plaintiff Ricca purchased a new 2023 Land Rover Range Rover Sport SE from an authorized JLRNA dealership in Wilmington, Delaware on May 25, 2023. (*Id.* ¶ 25.) Prior to purchasing his class vehicle, Plaintiff Ricca researched his vehicle by "googling it," reviewing websites of the manufacturer and dealership, and watching several television and YouTube commercials. (*Id.* ¶ 27.) He also reviewed the purchase agreement, financial agreements, Monroney window sticker, and discussed

6

the vehicle with an authorized JLRNA dealership representative. (*Id.*) Plaintiff Ricca relied on these representations and was never informed of the Radiator Defect. (*Id.* ¶¶ 27-28.)

After buying his vehicle, Plaintiff Ricca experienced the Radiator Defect as "coolant was leaking" out of the vehicle and "the low coolant light on the dashboard would illuminate." (*Id.* ¶ 29.) On February 13, 2024, Plaintiff Ricca took his vehicle to an authorized JLRNA dealership, "where they discovered coolant seeping from the turbo coolant pipe-o-rings." (*Id.*) The dealership "replaced the o-rings, added more coolant, and changed the oil," but the vehicle bean leaking fluid again within a few days of the repair. (*Id.*) Plaintiff Ricca's vehicle continues to leak coolant, and he "continually monitors" for coolant levels. (*Id.*)

### 3.  Bob Neuss

Plaintiff Bob Neuss ("Plaintiff Neuss") is a Florida citizen. (*Id.* ¶ 41.) On April 30, 2021, he purchased a certified, pre-owned 2018 Land Rover Range Rover Sport from an authorized dealership in Sarasota, Florida. (*Id.*) Prior to his purchase, Plaintiff Neuss researched his vehicle by reviewing dealership, manufacturer, and owner forum websites. (*Id.* ¶ 44.) Plaintiff Neuss also reviewed the purchase agreement, Monroney window sticker, and "discussed the vehicle with an authorized JLRNA dealership representative." (*Id.*) Plaintiff Neuss relied on these representations and was never informed of the Radiator Defect. (*Id.* ¶¶ 44-45.)

In May 2023, "with 35,900 on the odometer, Plaintiff Neuss began to experience" the Radiator Defect as "coolant was spraying out of the Class Vehicle while driving." (*Id.* ¶ 46.) Plaintiff Neuss took his vehicle to an authorized JLRNA dealership, "where they found coolant leaking at the aux thermostat and coolant pump." (*Id.*) In November 2024, Plaintiff Ness's vehicle began emitting white smoke from out of the hood and again leaking coolant. (*Id.* ¶ 47.) An

independent automative shop "confirmed there was a leak in the coolant system and replaced all coolant components." (*Id.*) Plaintiff Neuss paid out of pocket for these repairs. (*Id* ¶¶ 46-47.)

### 4. Melissa Bailey

Plaintiff Melissa Bailey ("Plaintiff Bailey") is a Rhode Island citizen. (*Id.* ¶ 50.) Bailey purchased a used 2018 Land Rover Range Rover Velar, on July 31, 2021, from Land Rover Glen Cove, located in Glen Cove, New York. (*Id.* ¶ 51.) Prior to purchasing her vehicle, Plaintiff Bailey "conducted research about her vehicle online, including reading articles about vehicle's safety features, reviewing the websites of the manufacturer and dealership, and viewing Land Rover ads on the internet." (*Id.* ¶ 53.) Plaintiff Bailey also "reviewed the purchase agreement, financing agreements, warranty documents, and window sticker, discussed the vehicle with an authorized JLRNA dealership representative, and took the vehicle for a test drive." (*Id.*) Plaintiff Bailey relied on these representations and was never informed of the Radiator Defect. (*Id.* ¶¶ 53-54.)

In August 2024, the "low coolant light in [Plaintiff Bailey's] vehicle illuminated. (*Id.* ¶ 55.) On August 30, 2024, "with approximately 68,940 miles on the odometer," she brought her vehicle to an authorized JLRNA dealership "for a routine multipoint inspection" and the dealership added more coolant to her vehicle. (*Id.*) In November 2024, Plaintiff Bailey "notified an authorized JLRNA dealership and Defendant's corporate office" about issues with her vehicle after the low coolant light illuminated in her vehicle again. (*Id.* ¶ 56.) On January 31, 2025, Plaintiff Bailey took her vehicle back to an authorized the dealership, which eventually "repaired [t]he coolant inlet pipes" in the vehicle, a fix she paid for out-of-pocket. (*Id.* ¶ 57.)

### 5. Nikki Kaloust

Plaintiff Nikki Kaloust ("Plaintiff Kaloust") is a Florida citizen. (*Id.* ¶ 60.) On February 5, 2021, Plaintiff Kaloust purchased a pre-owned 2018 Range Rover Sport from Dimmitt Land Rover

Clearwater, an authorized JLRNA dealership located in Clearwater, Florida. (*Id.*) Prior to purchasing her class vehicle, Plaintiff Kaloust and her husband researched her vehicle online, "including reading articles about the vehicle's safety features, reviewing the websites of the manufacturer and dealership, reviewing Kelley Blue Book, and viewing Land Rover ads on the internet." (*Id.* ¶ 63.) Plaintiff Kaloust also "reviewed the purchase agreement, financing agreements, warranty documents, and window sticker, discussed the vehicle with an authorized JLRNA dealership representative, and took the vehicle for a test drive." (*Id.*) Plaintiff Kaloust relied on these representations and believed her vehicle would be safe and reliable since she was never informed of the Radiator Defect. (*Id*. ¶¶ 63-64.)

In February 2025, with 47,000 miles on the odometer, "the Defect caused the coolant pipes in Plaintiff's Vehicle to rupture while being on driven on the highway," which "caused instant loss of all coolant, overheating, catastrophic engine failure, and steering issues." (*Id.* ¶ 65.) Plaintiff Kaloust towed her vehicle to a local authorized JLRNA dealership, spoke to personnel at the dealer, and was informed she would need to pay $18,000 to fix the vehicle. (*Id.* ¶ 66.)

### 6. Jessee Keane

Plaintiff Jessee Keane ("Plaintiff Keane") is a California citizen. (SAC ¶ 69.) On May 19, 2020 Plaintiff Keane purchased a 2018 Range Rover Sport from Audi Van Nuys located in Sherman Oaks, California. (*Id.* ¶ 70.) Prior to purchasing his vehicle, Plaintiff Keane "conducted research about his vehicle online, including reading articles about the vehicle's safety features, reviewing the websites of the manufacturer and dealership, and viewing Land Rover ads on the internet." (*Id.* ¶ 72.) Plaintiff Keane also "reviewed the purchase agreement, financing agreements, and warranty documents, and took the vehicle for a test drive." (*Id.*) Plaintiff Keane relied on these representations and was never informed of the Radiator Defect. (*Id.* ¶¶ 72-73.)

On February 5, 2022, Plaintiff Keane "experience[d] the Defect" when his vehicle, with 24,604 miles on the odometer, began leaking steam and fluid "from the engine area while driving." (*Id.* ¶ 74.) The dealership "found upper and lower coolant pipes leaking coolant" and "replaced the pipes and rear manifold." (*Id*.) On February 5, 2024, Plaintiff Keane brought his vehicle to Land Rover Van Nuys "because of the low coolant display." (*Id.* ¶ 75.) The dealership "found a leak under the supercharger and replaced the front and rear coolant pipes." (*Id.*) On February 1, 2025, Plaintiff Keane brought his vehicle back to the dealership because of low coolant and engine overheating displays. (*Id.* ¶ 76.) The dealership "performed a pressure test, found the thermostat leaking coolant and the water pump leaking, and then "replaced the thermostat housing and the water pump." (*Id.*) On February 25, 2025, "Plaintiff Keane brought the Vehicle to the Land Rover Van Nuys because of the low coolant display." (*Id.* ¶ 77.) The dealership performed an inspection, found a leak in the thermostatic control valve, and replaced "the supercharger and related components, the o-rings for the upper coolant outline pipe, the cross over pipe, and the thermostatic control valve." (*Id.*) Plaintiff Keane has paid out-of-pocket for repairs. (*Id.* ¶¶ 75-76.)

### 7.  Bob McGehee

Plaintiff Bob McGehee ("Plaintiff McGehee") is a citizen of Georgia. (*Id.* ¶ 80.) Plaintiff McGehee purchased a new 2021 Range Rover Sport SE Silver Addition on October 10, 2020 from Hennessy Jaguar Atlanta, an authorized JLRNA dealership in Atlanta, Georgia. (*Id*. ¶ 81.)

Prior to purchasing his vehicle, Plaintiff McGehee "conducted research about his vehicle online, including reading articles about the vehicle's safety features and reviewing the websites of the manufacturer and dealership." (*Id.* ¶ 83.) He also "reviewed the purchase agreement, financing agreements, warranty documents," Monroney window sticker, discussed the vehicle "with an authorized JLRNA dealership representative, and took one of the Class Vehicles for a test drive."

(*Id.*) Plaintiff McGehee relied on these representations and was never informed of the Radiator Defect. (*Id.* ¶¶ 83-84)

On October 19, 2022, Plaintiff McGhee "experience[d] the Defect when a low coolant notification illuminated," and he "was directed by an authorized JLRNA dealership to top off the coolant." (*Id.* ¶ 85.) The low coolant light continued to illuminate, but Plaintiff McGehee, upon contacting the dealership, was "repeatedly and always instructed [] to add more coolant." (*Id.* ¶ 86.) On December 7, 2022, with 51,631 miles on the odometer, Plaintiff McGehee "took his Vehicle to a Mavis Tire for diagnosis" when "the low coolant notification turned on again." (*Id.* ¶ 87.) The "Mavis Tire conducted a pressure test and told [Plaintiff McGehee] that the coolant was leaking, but they could not fix it." (*Id.*) Plaintiff McGehee then took his vehicle to Hennessy Jaguar Atlanta, where they replaced the coolant turbo lines, where he paid out of pocket for repairs. (*Id.*)

All Plaintiffs additionally alleged that Defendant did not disclose the Radiator Defect before Plaintiffs purchased the vehicles, even though it knew of the Defect. (*Id.* ¶¶ 20, 28, 44-45, 54-55, 63-64, 73, 84.) Plaintiff also allege that they would not have bought their Class Vehicles if they had known of the Defect. (*Id.* ¶¶ 45, 54, 64, 73, 83-84.)

### D.  The Second Amended Complaint and Motion to Dismiss

On March 25, 2025, Plaintiffs filed the Second Amended Complaint. (ECF 52, "SAC.") The SAC contains twenty counts: Count 1: breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303, *et seq.*; Count 2: breach of implied warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303, *et seq.*; Count 3: unjust enrichment; Count 4: fraud by omission or fraudulent concealment; Count 5: violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; Count 6: violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; Count 7: breach of implied warranty pursuant to

Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792 & 1791.1, *et seq.*[5]; Count 8: violations of Delaware's Consumer Fraud Act, Del. Code. Ann. Tit. 6 § 2513, *et seq.*; Count 9: violations of the Delaware Deceptive Trade Practices Act, Del. Code. Ann. Tit. 6 § 2531, *et seq.*; Count 10: breach of implied warranty of merchantability pursuant to Del. Code Ann. Tit. 6 §§ 2-314, 2A-103, & 2A-212; Count 11: breach of express warranty pursuant to Del Code. Ann. Tit. 6 §§ 2-313 & 2A-210; Count 12: violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*; Count 13: breach of implied warranty of merchantability pursuant to 13 PA. Cons. Stat. §§ 2314 & 2A212; Count of 14: breach of express warranty pursuant to 13 PA. Cons. Stat. § 2313 & 2A210;[6] Count 15: violations of the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201-.213; Count 16: breach of implied warranty of merchantability pursuant to F.S.A. §§ 672.314 & 680.212; Count 17: breach of express warranty pursuant to F.S.A. §§ 672.313 & 680.21; Count 18: violation of the New York General Business Law Act, N.Y. Gen. Bus. Law § 349; Count 19: violation of the New York General Business Law Act, N.Y. Gen. Bus. Law § 350; Count 20: breach of the implied warranty of merchantability pursuant to N.Y. U.C.C. §§ 2-315 & 2A-212; Count 21: breach of the express warranty of merchantability pursuant to N.Y. U.C.C. §§ 2-314 & 2A-210; Count 22: violation of Georgia's Fair Business Practices Act, Ga. Code. Ann. § 10-1-390, *et seq.*; Count 23: breach of implied warranty of merchantability pursuant to Ga. Code Ann. § 11-2-314 & 11-2A-212; Count 24: breach of express warranty pursuant to Ga. Code Ann. §§ 11-2-313 & 11-2A-210; Count 25:

---

[5] Plaintiffs concede Count 7: Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1972 & 1791.1. (ECF 55 at 37, n.9.) Plaintiffs also concede Count 9: Violations of the Delaware Deceptive Trade Act, Del. Code Ann. Tit. 6 § 2531. (*Id.* at 1 n.1.)

[6] Counts 12, 13, and 14 (on behalf of the Pennsylvania Sub-Class) are withdrawn due to Plaintiff Penelope Cillufo's voluntary dismissal. (ECF 54.)

declaratory and injunctive relief.[7] On April 30, 2025, Defendant moved to dismiss the SAC. (ECF 53.) On June 4, 2025, Plaintiffs filed an opposition. (ECF 55.) On July 1, 2025, Defendant filed a reply. (ECF 59.)

**E.  The Motion to Compel Arbitration of Plaintiff Joseph Ricca's Claims**

On June 18, 2025, JLRNA moved to compel arbitration of Plaintiff Joseph Ricca's claims. (ECF 57.) On July 21, 2025, Plaintiffs filed an opposition to the Motion to Compel Arbitration. (ECF 61.) On August 4, 2025, JLRNA filed a reply brief in further support of its Motion to Compel Arbitration. (ECF 65.)

**II.  <u>MOTION TO DISMISS</u>**

**A.  Legal Standard**

**1.  Rule 8**

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that any pleading that includes a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(d)(1) further provides that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). Together, "Rules 8(a) and 8(d)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702 (3d Cir. 1996) (quoting 5 *Wright & Miller's Federal Practice and Procedure* § 1217 (2d ed. 1990)).

---

[7] Several counts were mistakenly listed in the SAC. For the purposes of this opinion, the Court will adjust the following counts: Count 11 (listed as Count 1), Count 15 (listed as Count 2), Count 16 (listed as Count 3), Count 17 (listed as Count IVII), Count 19 (listed as Count "XVIV"), Count 20 (listed as Count 19), Count 21 (listed as Count 20), Count 22 (listed as Count 21), Count 24 (listed as Count 14), and Count 25 (listed as Count 24).

### 2.  Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." Id. at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorably to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

**B. Analysis**

In support of its Motion to Dismiss, Defendant first argues that the SAC fails to meet the pleading standard set forth in Federal Rule of Civil Procedure ("Rule") 8(a) because the description of the alleged defect is "vague, generic, and overbroad[.]" (ECF 53-2, MTD Br. at 7.) The Court agrees.

In this District, "[a]uthority is split as to the level of factual allegations required to plausibly plead a defect." *Armstrong v. BMW of N. Am.*, LLC, No. 23-3046, 2024 WL 3042822, at *3 (D.N.J. June 18, 2024). *The Armstrong* case adopted the reasoning set forth in *Wesley v. Samsung Elecs. Am., Inc.* requiring that the "level of specificity required to state a defect claim directly correlate to the complexity of the machinery in question . . . ." No. 20-18629, 2023 WL 3496024, *3 (D.N.J. May 17, 2023) (quoting *DeCoteau v. FCA US LLC*, No. 15-20, 2015 WL 6951296, *3 (E.D. Cal. Nov. 10, 2015)). Other courts in this district, however, have held that alleging a defect along with its effects are sufficient under Rule 8's liberal pleading standard. In *Williams v. Samsung Elecs. Am., Inc.*, No. 23-989, 2024 WL 1328133, *7 (D.N.J. Mar. 28, 2024), the court held that the complaint was sufficient under Rule 8 because it "identifie[d] (1) the parts across the [class products] alleged to be defective, (2) how these parts interplay[ed] in [the class products] stages of overheating and damage, and (3) examples of how the defect allegedly manifest[ed], including rendering the [class products] unusable." *Id.* Under either standard, the alleged defect here does not meet Rule 8's liberal pleading requirements.

Plaintiffs here allege that the Class Vehicles had a "Radiator Defect." (SAC ¶ 3.) Plaintiffs allege that "the Class Vehicles' radiator, radiator hose, and related components are defective in that they are designed, manufactured, and/or installed in a manner that causes cracks in the radiator

15

and/or leaks from the radiator hose(s), which lead to coolant leaking out of the vehicle." (*Id.*) The SAC further alleges that the Radiator Defect includes "1) inadequately designed, manufactured, or installed radiator assemblies; 2) the use of inadequate materials in the radiator assemblies which begin to degrade from the moment the components are exposed to coolant; and/or 3) improper design of the radiator assemblies." (*Id.*) The Defect allegedly "increases the risk of the engine overheating, stalling, and potentially failing[.]" (*Id.*)

These allegations are insufficient under Rule 8 when applying the standard set forth in *Armstrong*, 2024 WL 3042822, at *4. First, the Court cannot discern from these allegations what part of the Class Vehicles is allegedly defective. The term "Radiator assembly" is undefined in the SAC, but the SAC refers to the "radiator, radiator hose, and related components." (*Id.* ¶ 3.) The *Armstrong* court held that an alleged defect described similarly did not meet Rule 8. *See Armstrong*, 2024 WL 3042822, at *4 (complaint alleged that "the coolant lines in the Class Vehicles suffer from *one or more design and/or manufacturing defects* that causes them to prematurely wear at an accelerated rate because they are incapable of withstanding the high temperatures within the engine.") Just as in *Armstrong*, here Plaintiffs "allege the symptoms of a defective coolant line (i.e., leaking coolant), [but] they fail to plausibly allege what is actually defective in the coolant line." *Id.* (citing *DeCoteau*, 2015 WL 6951296 at *3).

Second, the Court finds these allegations insufficient to plead a defect even when applying the reasoning set forth in *Williams v. Samsung Elecs. Am., Inc.*, No. 23-989, 2024 WL 1328133 (D.N.J. Mar. 28, 2024) and *Weston v. Subaru of Am., Inc.*, No. 20-05876, 2022 WL 1718048, at *2 (D.N.J. May 26, 2022), two cases Plaintiffs rely on in their opposition. (MTD Opp. at 5.) In both cases, the courts emphasized that Plaintiffs were "not required to plead the mechanical details of an alleged defect in order to state a claim." *Williams*, 2024 WL 1328133, at *7 (citing *Milisits v.*

16

*FCA US LLC*, No. 20-11578, 2021 WL 3145704, at *3 (E.D. Mich. July 26, 2021)); *see also Weston*, 2022 WL 1718048, at *2 ("[T]he Court declines any invitation to impose a more rigorous pleading standard than that required by Federal Rule of Civil Procedure 8(a)(2): 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"). However, in both cases, the plaintiffs offered basic allegations about which components of the products at issue were defective. In *Williams*, which involved allegedly defective Samsung laptops, the plaintiffs alleged "the role of the various components" involved in the Class Laptops' "inadequate cooling system…" 2024 WL 1328133, at *7 (citations omitted). The complaint in *Williams* "explain[ed] how the Class Laptops buil[t] excessive heat: through 'inadequate ventilation' caused by the Class Laptops' 'shallow casing, insufficiently raised feet pads, and overcrowded internal hardware, [which] restrict[s] proper airflow….'" *Id.* The complaint further "explain[ed] that the Class Laptops' fans and heat sinks fail to effectively dissipate the built-up heat" and "that the Class Laptops are not constructed to withstand the excessive heat because the 'thermal paste and heat pipes' are 'subpar' as it pertains to thermal conductivity." *Id.*

In *Weston*, which involved allegedly defective Subaru vehicles, the court found plaintiffs' allegations adequate under Rule 8 where the plaintiffs alleged that all class vehicles shared the same brake mechanism and related componentry that contained (a) defects "in their integrated mechanical and electronic devices that transfer signals between components or networks"; (b) "defects in algorithms programmed to process real-time data"; (c) "defective circuit boards that cause the Vehicles' throttle position sensors, throttle body assemblies, powertrain control modules, and/or hydraulic brake systems to malfunction"; and/or (d) "defective brake override systems[.]" *Weston*, 2022 WL 1718048, at *2 (citations omitted).

17

In contrast to these cases, it is not clear how the radiator here is defective. Although Plaintiffs appear to narrow their description of the alleged defect later in the SAC to the radiator assemblies (SAC ¶¶ 99-104), these allegations only add to the confusion of what exactly Plaintiffs are attempting to plead. The SAC states that "the Radiator Defect results from the defective design and/or manufacturing of the radiator assemblies and their mounting framework in the Class Vehicles, including use of inadequately sized auxiliary radiator ducts[.]" (*Id.* ¶ 99.) Pointing to the "[radiator] assemblies' repeated torsion and flexion within the radiator mounting framework, including the auxiliary radiator duct[,]" Plaintiffs allege that "coolant leaks through cracks in the radiator assemblies[.]" (*Id.* ¶ 101.) According to Plaintiffs, "[a]s designed and manufactured by JLRNA, the auxiliary radiator assemblies in the Class Vehicles are not seated properly within the mounting framework (e.g., the auxiliary radiator ducts) because the mounting framework is inadequately sized and fitted to the Class Vehicles." (*Id.* ¶ 102.) The incorrect mounting framework thus "allows the radiator assemblies to flex and shift within the framework, causing the assembly materials to weaken over time, resulting in cracks to the radiator assemblies themselves." (*Id.* ¶ 103.) As a result, "[e]ngine coolant is then able to leach out of the vehicle at the radiator assembly site." (*Id.* ¶ 104.)

Although at first glance these allegations appear to cover the "role of the various components" involved in the Class Vehicles' defect pursuant to Rule 8's liberal pleading standard, *see Williams*, 2024 WL 1328133, at *7, these allegations still fail to identify (1) the parts across the [products] alleged to be defective [and] (2) how these parts interplay in [the products'] stages of [issues] and damage . . . ." *Williams*, 2024 WL 1328133, at *7. First, the "radiator assemblies," as alleged, still appear to cover multiple different unidentified parts. Second, based on how the SAC is currently pled, Plaintiffs' coolant leaks have different causes. Plaintiffs allege that all class

18

vehicles experienced "radiator mounting framework, including the auxiliary radiator duct[,]" which caused that "coolant leaks through cracks in the radiator assemblies[.]" (SAC ¶ 101.) However, Plaintiffs' vehicles' coolant leaks allegedly occurred through different mechanisms in their vehicles' coolant systems, not just the radiator.[8]

Similarly, alleged complaints from the National Highway Traffic Safety Administration (NHTSA) website and consumer complaints on third-party websites involved a variety of issues, including leaks from a water pump, a car bursting into flames after the "check engine" and "coolant" lights went on, failure of "rigid pipes in the coolant system," and other coolant leaks that were not tied to leaks from "the radiator assembly site." (SAC ¶¶ 104, 111–15.) Further, the TSB, Manufacturer Communication, and two SSMs that Plaintiff rely on to purportedly show there was a defect JLRNA's knowledge of the defect[9] (*id.* ¶¶ 123-26) only create more confusion. The TSBs, which address the alleged specific defect—"[f]lexing of the auxiliary radiator assembly within the

---

[8] *See* SAC ¶ 21 (Plaintiff Nowling's radiator, fan, gaskets, hoses, and belts needed replacement due to Defect," and car dealership "found seepage from water pump"); *id.* ¶ 29 (Plaintiff Ricca "discovered coolant seeping from turbo coolant pipe o-rings" and "[t]he dealership replaced the o-rings, added more coolant, and changed the oil."); *id.* ¶¶ 46-47 (Plaintiff Neuss "found coolant leaking at the aux thermostat and coolant pump" and the dealership "replaced the entire coolant, system, including the secondary thermostat, rear coolant manifold, and water pump"; the vehicle kept leaking coolant and the entire coolant system was replaced); *id.* ¶ 57 (Plaintiff Bailey's dealership repaired the coolant inlet pipes in Plaintiff Bailey's vehicle); *id.* ¶ 65 (Plaintiff Kaloust's vehicle's coolant pipes "rupture[d]"); *id.* ¶¶ 74-76 (Plaintiff Keane's dealership found "upper and lower coolant pipes [in his vehicle] leaking coolant" and also found "the thermostat housing leaking coolant and the water pump leaking"); *id.* ¶ 87 (Plaintiff McGehee's "coolant turbo lines were replaced.").

[9] The Manufacturer Communication, titled "Latest Vehicle Concern Fixes" with a subheading of "Coolant Leak," was issued in May 2020 and pertains to the 2018-2021 Land Rover Range Rover Velar vehicles; it identifies a Land Rover radiator coolant hose as the source of the leak" and directs dealers to gather "additional data from a vehicle before the hose is replaced." (*Id.* ¶ 123.) TSB 1, issued in January 2021 and pertaining to 2018-2020 Land Rover Range Rover Velar vehicles, provides information on a "Coolant Level Low Message" dashboards, and it "identifies the cause of the issue as '[f]lexing of the auxiliary radiator assembly within the mounting structure is causing cracking, resulting in an engine coolant leak.'" (*Id.* ¶ 124.) The Special Service Message, issued in November 2022, pertains to the 2018-2023 Land Rover Range Rover Velar, 2014-2023 Land Rover Range Rover Sport, 2020-2023 Land Rover Defender, 2017-2023 Land Rover Discovery, 2013-2023 Land Rover Range Rover vehicles, and later the 2024 Land Rover Velar, 2024 Land Rover Range Rover, and 2024 Land Rover Range Rover Sport. (*Id.* ¶ 125.) The Special Service Message is titled "Coolant Low" and concerns a "'warning displayed in the instrument Cluster' with an unknown cause." (*Id.*) TSB 2, issued in November 2022 and pertaining the 2018-2020 Land Rover Range Rover Velar vehicles, provides information on a "Coolant Level Low Message" on the dashboard, and it "identifies the cause of the issue as '[f]lexing of the auxiliary radiator assembly within the mounting structure is causing cracking, resulting in an engine coolant leak.'" (*Id.* ¶ 126.)

mounting structure is causing cracking, resulting in an engine coolant leak" (*id.* ¶¶ 124, 126)—cover only certain models of JLRNA vehicles and, as such, only Plaintiff Bailey's vehicle is covered by the TSBs.[10] (*See* ECF 53-3, Declaration of Tiffany M. Alexander ("Alexander Decl."); ECF 53-10, Alexander Decl. Ex. 5.) Similarly, the SSM relates to "multiple potential engine coolant leak paths" on vehicles with certain engines (*see* ECF 53-12, Alexander Decl. Ex. 7); Plaintiffs do not allege that the Class Vehicles contained these engines.

Considering Plaintiffs' experiences, NHTSA website complaints, third-party website complaints, and the referenced TSB and SSMs as alleged in the SAC, the SAC does not plausibly allege that the same defect caused the coolant leak across the class vehicles. According to the SAC, while the "defect" could be the "mounting assembly," it could also be the manufacturing or design of the "assembly," which itself allegedly involves multiple component parts, including but not limited to the "radiator, radiator hose, and related components." (SAC ¶ 3.). The cases Plaintiffs rely on in their opposition brief are distinguishable. In *Hardy v. Volkswagen Grp. of Am., Inc.,* 2025 WL 1409820 (D.N.J. May 14, 2025), plaintiffs alleged that the class vehicles suffered from multiple defects, and specifically alleged that each vehicle contained a defective suction jet pump, which led to two recalls of vehicles in the putative class. *Id.* at \*3. And in *Powell v. Subaru of Am., Inc.*, Plaintiffs alleged that their vehicles' windshields spontaneously cracked or broke. 502 F. Supp. 3d 856, 868-70 (D.N.J. 2020). Unlike those cases, which identify defective parts of the vehicles, here it is not clear from the SAC which component of the Class Vehicles contains a defect, what that defect is, and whether the defect is the same across Class Vehicles.

For the foregoing reasons, the Court dismisses Plaintiffs' SAC without prejudice to file a new complaint.

---

[10] There are no allegations that this Plaintiff had the TSB repair performed.

20

**III.    <u>MOTION TO COMPEL ARBITRATION</u>**

JLRNA argues that Ricca is bound by an arbitration agreement and class waiver provided in the 2023 Range Rover Sport Owner's Handbook ("Owner's Handbook") for Ricca's Vehicle (the "Arbitration Agreement"). (ECF 57-1, MTC Br. at 1-2.) The Owner's Handbook includes a New Vehicle Limited Warranty ("NVLW"), contained in a section of the Owner's Handbook referred to as the "Passport to Service." (MTC Br. at 1-2; ECF 57-3, Declaration of Nadira Kirkland ("Kirkland Decl.") ¶ 4; ECF 57-4, Kirkland Decl. Ex. 1 ("Passport to Service").) The Arbitration Agreement, located at the beginning of the Passport to Service section, states in relevant part that any dispute between the vehicle owner and JLRNA

> related to or arising out of your vehicle purchase, advertising for the vehicle, use of your vehicle, the performance of the vehicle, any service relating to the vehicle, the vehicle warranty, representations in the warranty, or the duties contemplated under the warranty, including without limitation claims related to false or misleading advertising, unfair competition, breach of contract or warranty, failure to repurchase or replace your vehicle, or claims for a refund or partial refund of your vehicle's purchase price (excluding personal injury claims), but excluding claims brought under the Magnuson-Moss Warranty Act, shall be resolved by binding arbitration at either your or our election, even if the claim is initially filed in a court of law.

Passport to Service at 488. The arbitration provision further states, in bolded, all-caps font, "[I]F YOU PURCHASED OR LEASED YOUR VEHICLE IN THE UNITED STATES, YOUR WARRANTY IS MADE SUBJECT TO THE TERMS OF THIS BINDING ARBITRATION PROVISION. BY USING THE VEHICLE, OR ACCEPTING BENEFITS UNDER THIS WARRANTY, INCLUDING HAVING ANY REPAIRS PERFORMED UNDER WARRANTY, YOU AGREE TO BE BOUND BY THESE TERMS." *Id.* at 489–90. The arbitration provision also provides an opt-out clause. *Id.* at 490. The parties dispute the enforceability of the Arbitration Agreement.

**A. Legal Standard**

The Federal Arbitration Act ("FAA") "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009) (citing 9 U.S.C. § 1 et seq.). "Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate . . . and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." *Id.* (internal quotations omitted). "The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Id.* Instead, "[b]efore compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Id.* (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)). If the response is affirmative on both counts, the FAA requires the court to enforce the arbitration agreement in accordance with its terms. *LoMonico v. Foulke Mgmt. Corp.*, No. 18-11511, 2020 WL 831134, at *3 (D.N.J. Feb. 20, 2020).

"It is well established that the [FAA] reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis*, 560 F.3d at 160 (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). "But this presumption in favor of arbitration 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Id.* (quoting *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)); *see also Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 n.3 (3d Cir. 2014) (the presumption in favor of arbitrability "applies only when interpreting the scope of an arbitration agreement, and not when deciding whether a valid agreement exists."); *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019)

22

("The presumption of arbitrability enters at the second step—it applies to disputes about the scope of an existing arbitration clause.").

The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). "Where the affirmative defense of arbitrability of claims is apparent on the face of the complaint (or…documents relied upon in the complaint)," courts apply the Federal Rule of Civil Procedure 12(b)(6) standard to decide a motion to compel arbitration. *Id.* at 773-74 (cleaned up). However, the Rule 12(b)(6) standard is inappropriate when the complaint does not contain the "requisite clarity to establish on its face that the parties agreed to arbitrate, or the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement[.]" *Id.* at 774 (internal quotations and citations omitted). In that event, "the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard." *Id.* (internal quotations and citations omitted).

Under Rule 56, summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). On that showing, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing Fed. R. Civ. P. 56(e)). If the nonmoving party fails to meet its burden, summary judgment may be granted against it. *Id.* at 249-50.

### B. Analysis

The Court must evaluate the present motion in accordance with the summary judgment standard under Rule 56. Ricca references the New Vehicle Limited Warranty ("NVLW") applicable to his vehicle, which contains the arbitration agreement, in the SAC. (*See* SAC ¶¶ 330-35.) However, the NVLW is not attached as an exhibit to the SAC and Ricca argues that he is not a signatory to the arbitration agreement and did not agree to submit to arbitration. (*See* ECF 61, MTC Opp.; ECF 61-1, Declaration of Joseph Ricca ("Ricca Decl.").) As such, the Court finds that Rule 56 applies because Ricca has "come forth with reliable evidence . . . that [he] did not intend to be bound by the arbitration agreement." *Guidotti*, 716 F.3d at 774.

### 1. Waiver

Before assessing the merits of Defendant's motion to compel arbitration, the Court first addresses Ricca's argument that Defendant has waived any right to compel arbitration. (MTC Opp. at 4-5.) The defense of "waiver occurs where a party has 'intentional[ly] relinquish[ed] or abandon[ed] . . . a known right.'" *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 339 (3d Cir. 2023) (quoting *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022)). In analyzing whether waiver has occurred, a "court focuses on the actions of the p[arty] who held the right" and is informed by the "circumstances and context of each case." *Id.* (quoting *Morgan*, 142 S. Ct. at 1713). A party that is aware of its right to arbitrate but "invoke[s] the litigation process, demonstrates a waiver of its alleged right to arbitrate." *Id.* at 340.

The Court finds that JLRNA has not waived its right to compel arbitration. The "circumstances and context" a court considers regarding waiver "can include considerations such as the timeliness of the arbitration request, the extent of the movant's merits-based arguments up to that point, and its participation in discovery." *Hejamadi v. Midland Funding, LLC*, No. 18-

24

13203, 2024 WL 3159316, at *5 (D.N.J. June 25, 2024) (citing *Coronel v. Bank of Am.*, 2022 WL 3443985, at *4 n.4 (D.N.J. Aug. 17, 2022)). Considering the procedural history and case status, JLRNA has not intentionally relinquished its right to arbitrate. Here, Ricca first appeared as a Plaintiff in the First Amended Complaint, filed on January 3, 2025. (ECF 34.) Although Defendant moved to dismiss the First Amended Complaint (ECF 41), the Court did not decide that motion to dismiss before Plaintiffs filed the Second Amended Complaint on March 25, 2025. (ECF 52.) JLRNA moved to dismiss the SAC on April 30, 2025, and promptly moved to compel arbitration of Ricca's claims less than two months later, on June 18, 2025. (ECF 57.) JLRNA's motion to compel arbitration was filed before this Court's decision on its motion to dismiss the SAC. *See White*, 61 F.4th at 339 (defendant had moved to arbitrate claims after its motion to dismiss was decided).

Moreover, JLRNA has not yet participated in any discovery. *See Hejamadi*, 2024 WL 3159316, at *5. Discovery has not begun in this case; the parties requested that the Court continue the initial scheduling conference and related deadlines until at least 30 days following the Court's ruling on the motion to dismiss the SAC and motion to compel arbitration. (ECF 64; ECF 66.) For these reasons, the Court rejects Ricca's argument that JLRNA waived its right to compel arbitration.

### 2. Delegation of Arbitrability

As a threshold matter, the parties dispute whether the question of arbitrability has been delegated to the arbitrator. (MTC Br. at 19-21; ECF 65, MTC Reply at 2-4; MTC Opp. at 21-26.) Although in its opening brief Defendant limited its argument regarding delegation to the scope of the arbitration agreement (*see* MTC Br. at 19), on Reply Defendant asserts that delegation includes "whether the arbitration agreement is valid and enforceable (a question of substantive

25

arbitrability)." (Reply at 2-3.) Plaintiffs contend that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." (MTC Opp. at 22 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).) The Court agrees with Plaintiff that in the circumstances here "[a] court must decide a dispute over the existence of the contract, because 'a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute.'" *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 752–53 (Del. Ch. 2023) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)).

### 3. Validity of Arbitration Agreement

The parties dispute whether the Arbitration Agreement in the Passport to Service is enforceable. Defendant argues that Ricca knew his car came with an express warranty and assented to the arbitration provision therein. (MTC Br. at 9-16.) Ricca contends that no arbitration agreement was ever formed because Ricca did not sign or assent to the Arbitration Agreement contained in the Owner's Handbook. (MTC Opp. at 9-18.) Ricca submitted a certification stating that he lacked reasonable notice of the Arbitration Agreement, which was placed on page 488 of the Owner's Handbook in the section titled "Passport to Service." (*Id.* at 12-13; *see also* Ricca Decl. ¶¶ 3-10).)

To determine the validity of an arbitration agreement, courts apply "ordinary state-law principles that govern the formation of contracts." *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The parties agree that the dispute is governed by Delaware law. (MTC Br. at 7; MTC Opp. at 5-6.) Under Delaware law, contract formation requires mutual assent, meaning a complete meeting of the minds of the parties. *United Health Alliance, LLC v. United Medical, LLC*, 2013 WL 6383026, at *6 (Del. Ch. Nov. 27, 2013).

26

"Establishing a meeting of the minds and mutual assent turns on the existence of 'reasonable notice to each contracting party of the contractual terms.'" *Alexander v. Lyft, Inc.*, No. N24C-09-064, 2025 WL 689696, at *2 (Del. Super. Ct. Mar. 4, 2025) (quoting *Payne v. Samsung Electronics America, Inc. et al.*, 2024 WL 726907 (Del. Super. Ct. 2024)); *Noble v. Samsung Electronics America, Inc.*, 682 F. App'x 113, 116 (3d. Cir. 2017)).

The Court agrees with Ricca that he did not have reasonable notice of the arbitration provision and therefore cannot be compelled to arbitrate his claims. The facts here are similar to those in *Noble v. Samsung Elecs. Am., Inc*, 682 F. App'x 113, 116 (3d Cir. 2017).[11] In *Noble*, which involved consumer fraud claims regarding an allegedly defective smartwatch, *id.* at 114, the Third Circuit affirmed the district court's decision denying a motion to compel arbitration where the consumers did not have reasonable notice of an arbitration agreement. *Id.* at 117-18. The arbitration agreement in *Noble* was on page 97 of a 143-page booklet included in the smartwatch packaging entitled "Health and Safety and Warranty Guide." *Id.* at 115. The *Noble* court observed that "the document in which the Clause was included did not appear to be a bilateral contract, and the terms were buried in a manner that gave no hint to a consumer that an arbitration provision was within . . . More particularly, there was no indication on the outside of the [Health and Safety and Warranty] Guide that it was a bilateral contract or included any terms or conditions." *Id.* at 116 (citation omitted).

As in *Noble*, here the arbitration provision was buried on page 488 of the Owner's Handbook in the Passport to Service section. (Kirkland Decl. Ex. 1.) There was no indication in the title of the handbook or in the table of contents that it contained an arbitration agreement or otherwise binding terms and conditions. (*See id.*)  Ricca submitted that no sales representative

---

[11] Although *Noble* applied New Jersey, not Delaware law, the analysis is applicable since under both New Jersey and Delaware law notice is required to establish mutual assent.

referenced JLRNA's Owner's Handbook or Passport to Service before or during the transaction where he purchased his Class Vehicle (Ricca Decl. ¶ 3); he was not informed of an arbitration provision before he purchased the vehicle (*id.* ¶ 4); and that he did not have an opportunity to "see, read, sign, agree to, or reject any of the terms in the Owner's Handbook or arbitration provision." (*Id.* ¶ 8; *see also id.* ¶¶ 7, 10.) In fact, Ricca stated that he was unaware of the Arbitration Agreement until JLNRA's motion. (*Id.* ¶ 9.)

Defendant's argument that Ricca knew that his automobile came with an express warranty and therefore had notice of the arbitration agreement is unavailing. (MTC Br. at 9-11; MTC Reply at 10-13.) Following the Restatement (Second) of Contracts, Delaware law provides three scenarios under which an offeree's silence or inaction function as acceptance to a contract:

> [1] Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.[;]
> [2] Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer [; and]
> [3] Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intent to accept.

*Andre v. Dollar Tree Stores, Inc.*, No. 18-142, 2019 WL 2617253, at *9–10 (D. Del. June 26, 2019) (quoting *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, No. 03A-08-002, 2005 WL 170690, at *5 (Del. Super. Ct. Jan. 14, 2005); Restatement (Second) Contracts § 69). As in *Noble*, here Ricca did not know, nor should have known, that the Owner's Handbook contained an arbitration agreement or other binding terms and conditions, and therefore buckets (1) and (2) of the above are inapplicable.[12] For the same reason, the shrinkwrap and clickwrap cases that Defendant relies on in its brief are inapposite. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) (product packaging contained "statement of terms" with arbitration agreement that

---

[12] JLRNA does not argue that previous dealings would have alerted Ricca to the Arbitration Agreement.

consumer admitted noticing); *ProCD v. Zeidenberg*, 86 F.3d 1447, 1450-52 (7th Cir. 1996) (product box declared that binding terms were stated in an enclosed agreement and those terms appeared every time the software ran); *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 681 (11th Cir. 2018) (arbitration agreement found enforceable where purchase terms were printed in full on the exterior of every package of product); *Westendorf v. Gateway 2000, Inc.*, No. 16913, 2000 WL 307369 (Del. Ch. Mar. 16, 2000) (arbitration agreement contained in "Standard Terms and Conditions Agreement" provided with shipment of computer was binding).[13]

"While it may sometimes be presumed that consumers agree to contractual provisions of which they are on notice, that presumption is warranted only where there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *Noble*, 682 F. App'x at 117–18. Ricca was not on notice of the arbitration agreement here. The Court agrees with Plaintiffs that the Arbitration Agreement in the Owner's Handbook is unenforceable against Ricca because Ricca did not have notice.

### 4. Equitable Estoppel

Defendant also argues that equitable estoppel applies to bar Ricca from contesting the applicability of the arbitration agreement. (MTC Br. 16-19.) The Court disagrees.

Estoppel can, in certain circumstances, bind nonsignatories to arbitration agreements. *See Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 755 (Del. Ch. 2023) ("A non-signatory can be bound to a forum selection provision under principles of equitable estoppel if the non-signatory has accepted a direct benefit under the agreement.") "The doctrine of equitable estoppel prevents

---

[13] Defendant's reliance on *Taylor v. CDS Advantage Sols.*, No. 22-02803, 2024 WL 1048124, at *7 (D.N.J. Mar. 9, 2024), *reconsideration denied*, No. 22-02803, 2024 WL 1635686 (D.N.J. Apr. 16, 2024) and *Horowitz v. AT&T Inc.*, No. 17-04827, 2019 WL 77331, at *8 (D.N.J. Jan. 2, 2019) is similarly unpersuasive because in those cases it was undisputed that the plaintiffs received notice of the arbitration agreements at issue. (*See* MTC Br. at 15-16.)

the non-signatory from accepting the benefits of the contract without also accepting its burdens, including the arbitration agreement." *Id.*   Under principles of estoppel, "a forum selection provision can bind the non-signatory if (i) the non-signatory accepted a direct benefit from the agreement or (ii) the non-signatory had a close relationship to the agreement, a signatory to the agreement controlled the non-signatory, and the circumstances establish that the signatory agreed to the forum selection provision on behalf of its controlled affiliate." *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, No. 2021-0288, 2021 WL 3630298, at *16 (Del. Ch. Aug. 17, 2021) *(*citing *Sustainability P'rs LLC v. Jacobs*, 2020 WL 3119034, at *6 (Del. Ch. June 11, 2020)).

JLRNA asserts that Ricca cannot take advantage of the express warranty for his vehicle by obtaining repairs under it and suing to enforce it "while at the same time rejecting the portions of the warranty, such as the arbitration and class waiver provisions, that he does not like." (MTC Br. at 16-17.) The Court disagrees with JLRNA's characterization of the Arbitration Agreement as a "portion" of the express warranty. JLRNA argues that the express warranty is the Arbitration Agreement's "container contract." (Reply at 8), but the Arbitration Agreement here appears in a standalone section of the "Passport to Service" titled "BINDING ARBITRATION FOR UNITED STATES VEHICLES ONLY." (Passport to Service at 488.) And under the Arbitration Agreement, use of the vehicle alone signifies acceptance, decoupling the Arbitration Agreement from the warranty. (*Id.* at 490 ("BY USING THE VEHICLE, OR REQUESTING OR ACCEPTING BENEFITS UNDER THIS WARRANTY, INCLUDING HAVING ANY REPAIRS PERFORMED UNDER WARRANTY, YOU AGREE TO BE BOUND BY THESE TERMS.").) The facts here are distinguishable from those in *Ford v. Hyundai Motor Am.*, upon which Defendant relies. No. 20-00890, 2021 WL 7448507, at *7 (C.D. Cal. Oct. 5, 2021). The court in *Ford* held that plaintiffs were equitably estopped from contesting an arbitration provision found in

their "Owner's Handbook & Warranty Information" booklet. *Id.* at *5-8. However, in *Ford*, plaintiffs were bound by the applicable arbitration provision only by accepting benefits under their warranty, not by mere use of the vehicle.[14] *Id.* at *6. Additionally, in *Ford*, unlike here, plaintiffs "expressly pleaded their awareness of, and agreement to be bound by, the terms of the 2020 Owner's Handbook, which contained the [New Vehicle Limited Warranty] and Arbitration Provision." *Id.* at *7.

For the foregoing reasons, the Court does not find that Ricca is equitably estopped from denying the validity of the Arbitration Agreement.

## IV.    **CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss the SAC (ECF 53) is **GRANTED**, and Defendant's motion to compel arbitration of Plaintiff Ricca's claims (ECF 57) is **DENIED**. An appropriate order follows.

*__/s/ Jamel K. Semper_____*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     James B. Clark, U.S.M.J.
        Parties

---

[14] The relevant provision at issue in *Ford* stated: "IF YOU PURCHASED OR LEASED YOUR VEHICLE IN CALIFORNIA, YOUR WARRANTY IS MADE SUBJECT TO THE TERMS OF THIS BINDING ARBITRATION PROVISION. BY ACCEPTING BENEFITS UNDER THIS WARRANTY, INCLUDING HAVING ANY REPAIRS PERFORMED UNDER WARRANTY, YOU AGREE TO BE BOUND BY THESE TERMS." *Ford*, 2021 WL 7448507, at *6.